PEOPLE OF the STATE OF ILLINOIS,
Illinois Commerce Commission and
Patrick W. Simmons, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Norfolk and Western Railway Company,
Intervening Respondent.

No. 81–2194.

United States Court of Appeals,
Seventh Circuit.

Argued April 9, 1982.

Decided Sept. 16, 1982.

Rehearing Denied Oct. 28, 1982.

James E. Weging, Sp. Asst. Atty. Gen., Commerce Com'n Div., Chicago, Ill., for petitioners.

Daniel B. Harrell, I. C. C., Washington, D. C., Martin M. Lucente, Sidley & Austin, Chicago, Ill., for respondents.

Before PELL, WOOD and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

This is an action to review a decision of the Interstate Commerce Commission (the "Commission") in which the Commission authorized the Norfolk and Western Railway Company (the "NW") to acquire the principal assets of the Illinois Terminal Railroad Company (the "IT"), and authorized or exempted from regulation certain related transactions. The Commission decision was entered under the provisions of the Interstate Commerce Act of 1978, Pub.L.No.95–473, § 11344, 92 Stat. 1436 (codified at 49 U.S.C. § 11344 (Supp. III 1979)), as modified by section 228 of the Staggers Rail Act of 1980, Pub.L.No.96–448, 94 Stat. 1931 (currently codified at 49 U.S.C.A. § 11344 (1982 Supp.)) (the "Staggers Act"), governing the consolidation of railroads. Certain parties intervened in the administrative proceedings objecting to the consolidation and subsequently joined in this petition for review. Petitioners here are the People of the State of Illinois; the Illinois Commerce Commission; and Patrick W. Simmons, the Illinois Legislative Director of the United Transportation Union. This petition apparently involves a matter of first impression under the relevant provisions of the Staggers Act. We affirm the decision of the Commission and dismiss the petition for review.

## I.

The IT operated a relatively small system of rail lines extending through central Illinois and across the Mississippi River to St. Louis, Missouri. In recent years, the IT operated unprofitably and its financial condition weakened. Hence, its major railroad owners [1] sought to sell and liquidate it in accordance with an agreement among themselves. On June 1, 1980, the IT, the NW and certain other railroads owning stock in the IT entered into a "Coordination Agreement and Plan for Liquidation of Assets" under which the "principal assets" of the IT would be bought by the NW, the remaining "peripheral assets" of the IT would be transferred to other carriers or abandoned and the IT would be liquidated.[2]

1. The owners of the IT, and their percentage ownership shares, are: NW, 18%; Burlington Northern, Inc., 18%; Chicago and North Western Transportation Co., 9%; Illinois Central Gulf Railroad Co., 18%; Consolidated Rail Corp., 9%; Baltimore and Ohio Railroad Co., 9%; Missouri Pacific Railroad Co., 9%; and the Chicago, Rock Island and Pacific Railroad Co., 9%. Only the Rock Island, which no longer conducts rail operations, dissented from the agreement here in issue.

2. The Plan provided that the NW would acquire much of the IT's rolling stock, in addition

On December 23, 1980, the NW and the IT filed a joint application with the Commission seeking authority under 49 U.S.C. § 11343 (Supp. III 1979) for the NW to buy the equipment and principal assets of the IT (with certain exclusions). This and related applications were accepted for consideration and consolidated by the Commission in its decision and notice of January 21, 1981. *Norfolk and Western Railway Co.— Purchase—Illinois Terminal Railroad Co.*, Finance Docket No. 29455, 46 Fed.Reg. 6086.

The Commission's decision and notice described the NW as a Class I rail carrier and the IT as a Class II rail carrier.[3] The Commission also noted, by quoting the statute (49 U.S.C.A. § 11344(d) (1982 Supp.)), that under the Staggers Act, if a proceeding does not involve the merger or control of at least two Class I railroads, the application must be approved unless the Commission finds that the transaction will produce a substantial anticompetitive effect *and* that the anticompetitive effect of the transaction will outweigh the public interest in meeting significant transportation needs. The Commission urged interested parties to file comments addressing these statutory criteria; the Commission also noted that a formal hearing was not contemplated but that such hearings would be held if necessary. Further, the Commission stated that the competitive insignificance of the transaction was reflected by the vote of the IT's shareholders approving the proposal since the six shareholders which also assented to the sale and liquidation of the IT were the NW's principal railroad competitors in the Midwest. Finally, the Commission noted that the proposed transaction was not of regional or national transportation significance.

Many parties filed comments pursuant to the Commission's notice. The principal opponents of the transaction were employees and employee organizations, concerned about adverse effects of the merger on employment. A number of shippers, the State of Illinois and other persons also expressed concern about the merger application. In a comment filed with the Commission, the State of Illinois argued that the merger would significantly affect competition among the railroad companies which owned the IT and that an oral hearing with cross-examination of the railroad witnesses was necessary to reveal the underlying motives for the merger. The State of Illinois also disputed the Commission's finding that the proposed merger was not of national or regional significance and the conclusion that the IT was a failing railroad.

In an order dated March 17, 1981, former Chairman Alexis, acting on behalf of the Commission, indicated that three general issues had been raised by the comments: adverse effects on employment, possible anticompetitive effects and the appropriateness of the purchase price.[4] The Chairman determined that issues concerning the merger's anticompetitive effects and the adequacy of the purchase price could be developed using the Commission's modified procedure. Under this modified procedure, oral hearings would not be held and the objectors would instead file sworn statements containing all the facts and arguments on which they intended to rely. *See* 49 C.F.R. §§ 1100.43(b), 1100.44(b) & 1100.- 45–54 (1981). Chairman Alexis determined, however, that the issue of adverse effects on railroad employees could best be developed at an oral hearing, which was held on April 7, 1981.[5] With respect to the anti-

---

to most of the IT's 420 miles of operating track, which paralleled track owned by the NW. Smaller segments of the IT's remaining operating track would be acquired by three other railroads. Finally, the Plan set out agreements between the NW and the several railroads also operating in the IT's service area concerning trackage, switching and other traffic rights.

**3.** The Commission defines as Class I railroads those "[c]arriers having annual carrier operat-

ing revenues of $50 million or more"; Class II railroads consist of carriers with annual operating revenues between $10 and $50 million. 49 C.F.R. pt. 1201, subpt. A, instr. 1–1(a) (1981).

**4.** The Chicago, Rock Island and Pacific Railroad Co., a shareholder which has ceased rail operations and is in bankruptcy, challenged the purchase price as too low.

**5.** The labor question presented was whether labor protection in excess of the standard *New*

competitive issue, the parties were again cautioned by the Chairman that under the Staggers Act amendments, the Commission believed that it "must approve [the] NW's proposed acquisition of [the] IT unless the acquisition will substantially reduce competition in freight surface transportation in a region of the United States." *Norfolk and Western Railway Co.—Purchase—Illinois Terminal Railroad Co.*, Finance Docket No. 29455, at 3 (Chrmn. Alexis, Mar. 17, 1981) (footnote omitted). If the acquisition would substantially reduce competition, the Chairman noted that it could still approve the acquisition "if the public interest benefits exceed the anti-competitive effects." *Id.* at 3 n.2. The Chairman's order thus indicated that the verified statements of the parties should be addressed to the anti-competitive issue as so formulated notwithstanding that other evidence related to the three principal issues might also be presented.

The petitioners in the instant action appealed the Chairman's procedural order of March 17, 1981, to a division of the Commission on grounds that the public was unfamiliar with the "modified procedure" and the submission of "verified statements." The petitioners requested the Commission to hold an oral hearing on all issues in place of the modified procedure. This appeal was denied by the division, which noted, *inter alia*, that verified statements had consistently been used successfully in similar proceedings, that the State of Illinois had repeatedly participated in other proceedings through the modified procedure, and that the Staggers Act had provided only limited time in which the Commission must act on the application and thus the Commission did "not have the luxury of extended oral hearings." *Norfolk and Western Railway Co.—Purchase—Illinois Terminal Railroad Co.*, Finance Docket No. 29455 (Sub-Nos. 1–5) at 2 (Comm'n Div. 2, April 6, 1981).[6]

Shortly after this decision, the State of Illinois and the Illinois Commerce Commission advised the Commission that they were unwilling to proceed under the modified procedure format and they thus adduced no additional evidence on the appropriateness of the transaction. Patrick W. Simmons submitted the only evidence opposing the transaction on the ground of potential anticompetitive effect. The lone shipper who participated in the evidentiary phase of the "modified procedure" supported the transaction principally on grounds that the IT was in precarious financial condition and that the shipper's transportation needs would be best satisfied by a larger railroad with greater financial resources. Certain expert consultants addressed at length the issues of competition and the public interest and concluded that the transaction would not reduce competition but would instead benefit the public interest.

On June 19, 1981, the full Commission granted each of the petitions requested by the NW and IT. *Norfolk and Western Railway Co.—Purchase—Illinois Terminal Railroad Co.*, 363 I.C.C. 882 (1981). The Commission adhered to its earlier position that unless the rail consolidation transaction involved more than one Class I rail carrier it must find that the consolidation will produce significant anticompetitive effects before it is required to review the traditional public interest factors. Based on the ample evidence before it, the Commission concluded that the transaction in question would involve neither a substantial lessening in competition, nor the creation of a monopoly nor a restraint of trade in freight surface transportation. *Id.* at 886–88. Since the transaction met the tests of 49 U.S.C.A. § 11344(d) (1982 Supp.), as amended by the Staggers Act, the Commission approved it.

The petitioners and various labor organizations then filed with the Commission both

---

*York Dock* conditions should be required. *See New York Dock-Control-Brooklyn Eastern Dist.*, 360 I.C.C. 60 (1979) (conditions provide full salary and benefit protection for up to 6 years).

6. Under the Staggers Act a total of 150 days are allowed to conclude evidentiary proceedings and issue a final decision in a case of this sort. *See* 49 U.S.C.A. § 11345(d) (1982 Supp.); note 14 *infra*.

requests to stay the effective date of the agency's decision and requests to reopen the proceedings for oral hearing and reconsideration. Chairman Taylor, who had been recently appointed to the Commission, denied the requests for stay of the Commission's decision. *Norfolk and Western Railway Co.—Purchase—Illinois Terminal Railroad Co.*, Finance Docket No. 29455 (Sub-Nos. 1–7) (July 17, 1981). The Commission also denied the requests to reopen and reconsider on November 2, 1981. *Norfolk and Western Railway Co.—Purchase—Illinois Terminal Railroad Co.*, Finance Docket No. 29455 (Sub-No. 1) (Nov. 2, 1981). In denying these requests, the Commission rejected arguments that it should hold oral hearings under the public interest standard of 49 U.S.C.A. §§ 11344(b) and (c) (1982 Supp.), and reiterated that the more limited competitive analysis of section 11344(d) was applicable. The Commission also rejected certain contentions (not now before us) concerning the level of employee protective conditions that it had imposed on most of the transactions involved in this railroad consolidation. This petition for review followed.

7.  To provide a meaningful comparison with the Staggers Act amendments discussed *infra*, we reproduce here 49 U.S.C. § 11344 (Supp. III 1979) (the predecessor statute) which provided in pertinent part as follows:

> (a) The Interstate Commerce Commission may begin a proceeding to approve and authorize a transaction [involving consolidation, merger or acquisition of control of carriers] referred to in section 11343 of this title on application of the person seeking that authority.... The Commission shall hold a public hearing when a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of that chapter is involved in the transaction unless the Commission determines that a public hearing is not necessary in the public interest.
>
> (b) In a proceeding under this section, the Commission shall consider at least the following:
>
> (1) the effect of the proposed transaction on the adequacy of transportation to the public.
>
> (2) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.
>
> (3) the total fixed charges that result from the proposed transaction.

## II.

The only issues presented on this petition for review are (1) the proper interpretation of 49 U.S.C. § 11344, as amended by the Staggers Act, regarding the Commission's refusal to consider public interest factors absent a prior showing of anticompetitive effect, and (2) the propriety of the Commission's use in the instant case of "modified procedures," involving written submissions rather than an oral hearing.

■ With respect to the interpretation of section 11344 and the consideration of public interest factors, we note that before October 1980 the Commission was required to apply the same statutory test to all rail carrier consolidations regardless of their scope, complexity or importance. The then governing statute, 49 U.S.C. § 11344(c) (Supp. III 1979),[7] provided that the Commission must authorize any requested consolidation if it found the transaction to be "consistent with the public interest." Former section 11344(b) (before the Staggers Act amendments), in turn, set forth a non-exclusive list of four factors that the agen-

> (4) the interest of carrier employees affected by the proposed transaction.
>
> (c) The Commission shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest. The Commission may impose conditions governing the transaction. When the transaction contemplates a guaranty or assumption of payment of dividends or of fixed charges or will result in an increase of total fixed charges, the Commission may approve and authorize the transaction only if it finds that the guaranty, assumption, or increase is consistent with the public interest. When a rail carrier, or a person controlled by or affiliated with a rail carrier, is an applicant and the transaction involves a motor carrier, the Commission may approve and authorize the transaction only if it finds that the transaction is consistent with the public interest, will enable the rail carrier to use motor carrier transportation to public advantage in its operations, and will not unreasonably restrain competition. When a rail carrier is involved in the transaction, the Commission may require inclusion of other rail carriers located in the area involved in the transaction if they apply for inclusion and the Commission finds their inclusion to be consistent with the public interest.

cy was to consider in evaluating consistency with the public interest.[8]

Section 228 of the Staggers Act altered considerably the standards for rail carrier consolidation applications filed after October 1, 1980.[9] A fifth factor was added to the list of factors spelled out in section 11344(b) and language was added to the subsection indicating that the factors set out in it applied only to transactions involving two or more Class I railroads ("major rail consolidations").[10] 49 U.S.C.A. § 11344(b) (1982 Supp.). Section 11344(b) now reads as follows (material added by the Staggers Act is italicized):

> In a proceeding under this section *which involves the merger or control of at least two class I railroads, as defined by the Commission,* the Commission shall consider at least the following:
>
> (1) the effect of the proposed transaction on the adequacy of transportation to the public.
>
> (2) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.

**8.** In determining consistency with the public interest, the Commission may decide what considerations beyond those specifically mentioned in the statute should be given weight. *Gilbertville Trucking Co., Inc. v. United States,* 371 U.S. 115, 127, 83 S.Ct. 217, 224, 9 L.Ed.2d 177 (1962).

**9.** Section 228(e) of the Staggers Act, 94 Stat. 1934, provided that consolidation applications filed or pending on October 1, 1980, "shall be adjudicated or determined as if [the new law] had not been enacted."

**10.** *See supra,* note 3.

**11.** Section 11344, as amended by the Staggers Act, now provides:

(a) [Unchanged by Staggers Act; *see supra,* note 6.]

(b) In a proceeding under this section which involves the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall consider at least the following:
(1) the effect of the proposed transaction on the adequacy of transportation to the public.
(2) the effect on the public interest of including, or failing to include, other rail carriers in the area involved in the proposed transaction.

(3) the total fixed charges that result from the proposed transaction.

(4) the interest of carrier employees affected by the proposed transaction.

(5) *whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region.*

To govern rail consolidations *not* involving the merger or control of two or more Class I railroads ("minor rail consolidations"), the Staggers Act added a new section. This section, codified at 49 U.S.C.A. § 11344(d) (1982 Supp.) (emphasis supplied), directs the Commission to approve a proposed consolidation *"unless"* the Commission finds that:

(1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

(2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs.[11]

(3) the total fixed charges that result from the proposed transaction.
(4) the interest of carrier employees affected by the proposed transaction.
(5) whether the proposed transactions would have an adverse effect on competition among rail carriers in the affected region.

(c) [Unchanged by Staggers Act, *see infra,* note 6.]

(d) In a proceeding under this section which does not involve the merger or control of at least two class I railroads, as defined by the Commission, the Commission shall approve such an application unless it finds that—

(1) as a result of the transaction, there is likely to be substantial lessening of competition, creation of a monopoly, or restraint of trade in freight surface transportation in any region of the United States; and

(2) the anticompetitive effects of the transaction outweigh the public interest in meeting significant transportation needs. In making such findings, the Commission shall, with respect to any application that is part of a plan or proposal developed under section 5(a) (d) of the Department of Transportation Act (49 U.S.C. 1654(a)–(d)), accord substantial weight to any recommendations of the Secretary of Transportation.

The Staggers Act did not alter section 11344(c), which essentially provides that the Commission should approve a consolidation transaction when it determines that the transaction is consistent with the public interest. *See* 49 U.S.C.A. § 11344(c) (1982 Supp.).

■ In addressing the question presented here regarding the proper interpretation of 49 U.S.C.A. § 11344 (1982 Supp.), we first note that the Staggers Act has separated rail consolidation proposals into two distinct groups: major rail consolidations, which involve the merger or control of two or more Class I railroads, and minor rail consolidations, which do not involve the consolidation of two or more Class I railroads. As the Commission and the NW argue, a careful reading of the amended section 11344 in its entirety discloses that the broad public interest standard of section 11344(c) applies only to consolidations of two or more Class I railroads whereas the more limited criteria of section 11344(d) apply to all other rail consolidations.

■ Consistent with the analysis that rail consolidation transactions now fall into two distinct categories, the Commission and the NW point out that the standards for approval under sections 11344(c) and 11344(d), respectively, are distinct. Thus, section 11344(d) provides that the Commission "shall approve" a minor rail consolidation "unless it finds that" (1) an anticompetitive effects are substantial, *"and"* (2) those effects outweigh the public interest in meeting significant transportation needs. The mandatory language "shall approve" of section 11344(d), taken in context, denotes that if the Commission finds no substantial anticompetitive effects flowing from the proposed transaction, its analysis is at an end. At that point, the Commission *must* approve the transaction, and any finding about consistency with the public interest would be superfluous. In other words, section 11344(d) provides *two* prerequisites for disapproval of a transaction: (1) substantial

anticompetitive effects *and* (2) anticompetitive effects that outweigh the public interest in meeting significant transportation needs. This is the plain meaning of section 11344(d), and that subsection, which is quite specific, governs the result under section 11344 for consolidations not involving two or more Class I railroads. The words "shall approve" in this context should be construed to *require* approval of transactions where no substantial anticompetitive effects are found. *See Minder Beef Co. v. Cost of Living Council,* 362 F.Supp. 298, 305 (D.Neb.1973); *Munger v. United States,* 154 F.Supp. 417, 423 (M.D.Ala.1957).

■ Section 11344(c), on the other hand, unconditionally requires an initial finding that a proposed transaction (without specification as to size) be consistent with the public interest in meeting significant transportation needs. Petitioners contend, *inter alia,* that our construction of the amended statute separating transactions involving two or more Class I railroads from all other transactions effectively reads the phrase in section 11344(c), which purports to apply a public interest standard to cases "under this *section,*" out of the law as it applies to *minor* rail consolidations. [Emphasis supplied.] In effect, petitioners assert that the phrase "under this section" means that the public interest standard of section 11344(c) applies to *all* cases regardless whether classified as major or minor rail consolidations. Thus, under petitioners' construction, even a minor rail consolidation subject to section 11344(d) cannot be approved unless it is demonstrated to be consistent with the public interest.

Although we believe that the draftsmanship of the Staggers Act might have been more artful on this point, it is nonetheless entirely feasible to read section 11344(c) as applying only to major rail consolidations covered by 11344(b). Section 11344(b) (unlike 11344(d)) states no criteria for "approval" of the transactions it covers; it merely lists some of the traditional public interest

(e) [New provisions (not involved in this case) allowing a rail carrier and shippers to

petition for motor carrier transportation if rail service is inadequate.]

factors that the Commission is required "to consider." Section 11344(c), when applied to section 11344(b), provides the otherwise missing standard for approval of major rail consolidations.[12] Similar application of section 11344(c) to section 11344(d) is, on the other hand, wholly inappropriate since section 11344(d) already expressly stipulates the circumstances under which the Commission "shall approve" a transaction. To read 11344(c) into 11344(d) would contradict the plain language of 11344(d), which has been recently enacted and which has specific application to minor rail consolidations.[13]

Petitioners also argue that section 11344(d) cannot be interpreted as requiring a finding of anticompetitive effects as a prerequisite to consideration of the public interest in the proposed transaction. In support of this argument, petitioners claim subsection (1) of section 11344(d) is separated from subsection (2) by a word having disjunctive rather than conjunctive force; in fact, they ask us to construe the word "and," which is used in section 11344(d) to separate these two subsections, as meaning "or." While such an approach might be dictated in rare cases by the most compelling considerations, cf. *United States v. Fisk*, 70 U.S. 243, 244, 18 L.Ed. 243 (1866), we do not propose to tamper here with the plain English. The word "and" requires the conjunction of criterion (1) and criterion (2) of subsection ·(d) in the fashion we have indicated. Only if substantial anticompetitive effects are found is it appropriate to balance them against public interest factors.

**12.** Indeed, the· language of section 11344(c) tracks the factors enunciated in considerably more detail in section 11344(b), lending even more support to a construction that reads subsections (b) and (c) together. *See supra,* notes 7 & 11.

**13.** Although section 11344(d)(2) requires the Commission to review public interest factors if it finds substantial anticompetitive effects, that provision does *not* require the agency to determine whether the transportation is "consistent with the public interest" under section 11344(c). Rather, if anticompetitive effects are substantial, the agency must balance against

Our interpretation of 49 U.S.C. 11344, as amended by the Staggers Act, is clearly supported by the legislative history. The Conference Report accompanying the Staggers Act states:

> In order to meet the deadlines specified in this section [228 of the Staggers Act [14] ] the number of factors the Commission must consider in ruling on transactions less than merger must be reduced. (The Commission now applies the same test to all transactions as to *major mergers.*) This section would require the Commission to balance the transportation benefits of the transactions against *any* anticompetitive effects.

*Conf.Rep.No.*1430, 96th Cong., 2d Sess. 120, *reprinted in* 4 U.S.Code Cong. & Ad.News 4110, 4152 (1980) (emphasis supplied). This language suggests that Congress intended to reduce the factors the Commission must consider for minor rail consolidations in part because of the limited amount of time Congress granted to the Commission, *see, supra,* note 14, to act on this type of transaction. And the last sentence of the quoted report requires balancing of transportation benefits only if *any* anticompetitive effects are discerned. As the Commission pointed out in its decision approving the NW/IT consolidation, "[a]ny effort to review [issues unrelated to competition] would remove all limits on the 'number of issues' [the Commission] must consider in approving a transaction; it would frustrate Congress' intent in enacting subsection 11344(d)." 363 I.C.C. at 891. Petitioners' interpretation of section 11344(d) would not only fail to produce

those effects "the public interest in meeting significant transportation needs."

**14.** As discussed in the text above, the Staggers Act amendments bifurcated (for procedural purposes) transactions not involving two or more Class I railroads. Shorter statutory deadlines (either 150 or 270 days) apply to the Commission's handling of such proposals if the transaction involves a minor rail consolidation, *see* 49 U.S.C.A. §§ 11345(c) & (d) (1982 Supp.), compared to the longer time period (420 days) in which the Commission may act on a major rail consolidation. *Id.* at § 11345(b).

"fewer" factors for consideration (contrary to the intentions of the Congressional Conference Committee), but also would require the Commission to consider as many factors as, or more factors than, the five factors it is required to consider in section 11344(b) major rail consolidations.

■ We also generally agree with the Commission's view that by enacting section 11344(d), Congress legislatively determined that rail consolidations not involving the merger or control of two or more Class I railroads *and* not having substantial anticompetitive effects *are* consistent with the public interest and should be approved.[15] This interpretation is consistent with the Congressional findings made in connection with the Staggers Act that "many of the government regulations affecting railroads have become unnecessary and inefficient"

15. In its brief, the Commission suggests that a national policy favoring railroad consolidation had its origins in the Transportation Act of 1920, § 407, Pub.L.No.66–152, 41 Stat. 456, 481 82 (current version codified at 49 U.S.C.A. §§ 11341-11346 (1982 Supp.)), which required the Commission to adopt a plan for consolidating the nation's rail system and permitted the Commission to approve applications for railroad mergers and consolidations. The same pro-consolidation policy was also evident in the Transportation Act of 1940, § 7, Pub.L.No..54–785, 54 Stat. 898, 905–06 (current version codified at 49 U.S.C.A. §§ 11341–11346 (1982 Supp.)), which continued the practice of allowing railroads to initiate consolidations. Still later, according to the Commission, Congress reaffirmed its consolidation policy in the Railroad Revitalization and Regulatory Reform Act of 1976, §§ 101(a)(3), 401–403, Pub.L.No.94–210, 90 Stat. 31 (current version codified at scattered sections in 49 U.S.C.) ("Four R Act"). The national policy of railroad consolidation encouraged transactions that resulted in economies and efficiencies. *See Northern Lines Merger Cases*, 396 U.S. 491, 509, 90 S.Ct. 708, 716, 24 L.Ed.2d 700 (1970); *Texas v. United States*, 292 U.S. 522, 530–31, 54 S.Ct. 819, 824, 78 L.Ed. 1402 (1934). The Staggers Act, in the view of the Commission, attempts to facilitate consolidation transactions of relatively minor scope by the section 11344(d) regulatory standard and thus is consistent with this national policy.

16. In terms of policy, the Staggers Act provision that, for relatively minor rail consolidations, no "public interest" findings are required

and that "[m]odernization of economic regulation for railroads, with greater reliance on the market place, is essential to achieve maximum utilization of railroads, to save energy and to combat inflation." *Conf. Rep.No.*1430, 96th Cong., 2d Sess., 7, 9, *reprinted in* 4 U.S.Code Cong. & Ad.News 4110, 4111 (1980).[16]

Petitioners also argue that for proceedings involving motor carriers,[17] the Commission has stated that it will not apply to motor carrier transactions the interpretation of section 11344(d) which it is now urging for minor rail consolidations. In the case of motor carriers, the Commission has continued to require a finding that the consolidation is consistent with the public interest as dictated by section 11344(c) regardless of the size or the nature of the transacting parties. Presumably, by its lit-

absent substantial anticompetitive effects does not seem outrageous. Consolidation transactions may unfortunately reduce employment, but their only other likely clear and direct adverse effect would seem to be on competitors and on competition. Presumably there would also be beneficial effects on efficiency through elimination of duplication. Adverse effects on *service*, however, (which, in our view, represent the crux of the concerns voiced by the State of Illinois and some shippers currently serviced by the IT) would not apparently be direct and immediate and presumably would, at least in most cases, require further regulatory approval (for abandonments and the like). *See, e.g., In re Chicago, Milw., St. P. and Pac. R.R. Co.*, 611 F.2d 662 (7th Cir. 1979) (*per curiam*); 49 U.S.C. §§ 10903–10906 (Supp. III 1979). In this case, the IT separately filed for, and was granted, an exemption from the statutory requirements for rail abandonments with respect to its abandonment of trackage rights over certain railroad bridges. Presumably, any other service reductions or abandonments would require the IT or the NW to follow the appropriate regulatory procedures. Hence, if substantial adverse effects on competition are absent, it is not unreasonable to presume that the public interest has been served. The Staggers Act amendments to section 11344 may have the effect, if not the purpose, of implementing such a "public interest" presumption.

17. *See* ICC Docket Ex Parte No. 55 (Sub-No. 53), *Motor Carrier Consolidation Procedures, General Policy Statement*, 46 Fed.Reg. 51413 (Oct. 20, 1981).

eral terms, section 11344(d) is applicable to motor carrier transactions since such transactions admittedly do not "involve the merger or control of at least two Class I railroads" and are thus outside the literal exemption of this section. But we think this motor carrier policy statement is irrelevant to the instant proceeding. And in any event, the Commission's conclusion that the Staggers Act amendments to section 11344 were not intended to change the standard applicable to motor carrier consolidations appears reasonable and not inconsistent with our analysis here. The Commission based its determination as to motor carriers on both the legislative history of the Staggers Act, which indicates that the Act was directed solely at rail transportation matters, and the temporal proximity of that legislation to the Motor Carrier Act of 1980, Pub.L.No.96–296, 94 Stat. 793 (pertinent provisions codified at 49 U.S.C.A. §§ 11342–11343, 11345a (Supp.1982)), which made no change in the statutory standard for motor carrier consolidations.

■ We also believe that our construction of 49 U.S.C. § 11344 is strongly supported by the Commission's contemporaneous construction of this statute. "[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong . . . ." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). *See also Miller v. Youakim*, 440 U.S. 125, 145 n.25, 99 S.Ct. 957, 969 n.25, 59 L.Ed.2d 194 (1979). In this case, the Commission's interpretation is entitled to deference because "the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'" *Power Reactor Development Co. v. Electrical*

*Workers*, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961) *quoting Norwegian Prods. Co. v. United States*, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). *See also Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 549, 60 S.Ct. 1059, 1067, 84 L.Ed. 1345 (1940).

Finally, we note that in its notice of January 21, 1981, the Commission quoted from the criteria of section 11344(d) as recently amended by the Staggers Act and "cautioned" the parties to address these standards. In the Chairman's procedural decision of March 17, 1981, the Commission clearly announced the very interpretation of section 11344(d) which is in issue in the instant petition for review. This interpretation was restated by the Commission in its decision on the merits, which is presently under review. But petitioners apparently failed to challenge the statute before the Commission on the grounds asserted on appeal until they filed their petition to reopen the administrative proceedings on July 13, 1981. The NW argues that petitioners' failure to object more timely to the Commission's interpretation of the statute constituted a waiver of this objection and that it therefore cannot be raised on appeal. Since we have exhaustively addressed the question on the merits and petitioners did raise the argument in their reconsideration motions, we decline to decide the question of waiver. We also decline to address the issue whether petitioners are estopped from objecting to the Commission's decision because of their refusal to produce any evidence on the question of the "public interest" (going beyond matters of anticompetitive effect).[18] As indicated, we believe the Commission's interpretation of the statutory criteria applicable to the transaction at issue here is correct, and petitioners must fail in this branch of their challenge.[19]

---

**18.** Petitioner Patrick W. Simmons produced some evidence of anticompetitive effect, which the Commission addressed and rejected. 363 I.C.C. at 886–88.

**19.** In their reply brief petitioners point to certain testimony of Commission Chairman Reese

H. Taylor, Jr. before the Surface Transportation Subcommittee of the Senate Committee on Commerce Service and Transportation, given November 10, 1981. In an Appendix IV to his testimony titled "Problem Areas," Chairman Taylor noted the interplay between amended subsections (b) and (d) and unamended subsec-

### III.

The second issue raised by the petition for review is whether a public hearing was required for questions other than labor protection, involving the public interest. In their reply brief, petitioners apparently concede that this procedural issue is relevant only if we determine that the Commission erred in its substantive interpretation of section 11344. Hence, since we agree with the Commission that under Section 11344(d) there need be no showing of public interest factors unless substantial anticompetitive effects are demonstrated, we need not, consistent with petitioners' apparent concession, consider the procedural objection.

In any event, we think that the Commission was well within its rights in following a "modified" procedure for matters other than labor protection in this case. The statute provides in pertinent part that

> [t]he Commission shall hold a public hearing when a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of [chapter 105] is involved in the transaction unless the Commission determines that a public hearing is not necessary in the public interest.

49 U.S.C. § 11344(a) (Supp. III 1979).

Here the Commission exercised its discretion under section 11344(a) to set the labor protection matters for public hearing and to consider other subjects through written submissions. We are reluctant to interfere with the Commission's exercise of discretion in this matter, especially in light of the Supreme Court's recent admonition "that the formulation of procedures was basically

to be left within the discretion of the agencies to which Congress has confided the responsibility for substantive judgments." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978). Our hesitancy to usurp the Commission's procedural prerogatives is buttressed by its careful conclusion that oral hearings would assist "in determining whether there are any adverse effects which render inappropriate the normal level of employee protection imposed in rail consolidation proceedings," but that "a complete and full record" concerning other issues could be obtained by using modified procedures. *Norfolk and Western Railway Co.—Purchase—Illinois Terminal Railroad Co.*, Finance Docket No. 29455, at 3–4 (Chrmn. Alexis, Mar. 17, 1981).

Under the Commission's modified procedure, the parties submit their evidence in written form. *See* 49 C.F.R. §§ 1100.43–.52 (1981). The parties may obtain oral hearings on any material factual matter that they demonstrate to be in dispute, and they may move to strike opposing written testimony and argument. The validity of these procedures has been consistently upheld. *See, e.g., Crete Carrier Corp. v. United States*, 577 F.2d 49, 50 (8th Cir. 1978); *Subler Transfer, Inc. v. United States*, 396 F.Supp. 762, 765 (S.D.Ohio 1975); *Allied Van Lines Co. v. United States*, 303 F.Supp. 742, 749–50 (C.D.Cal.1969).

The Commission's rules governing modified procedure specifically provide for oral hearings upon a demonstration that material facts are in dispute.[20] 49 C.F.R. § 1100.51 (1981). Under our view of the law, no such dispute has been shown here.

tion (c) of section 11344 as a problem area in the legislation possibly in need of redrafting. As noted above, we agree that amended section 11344 could benefit from more artful draftsmanship. Nevertheless, we believe we have captured the meaning of language which, although somewhat unartfully crafted, points

clearly to the destination its authors were attempting to reach.

**20.** To be considered material, a disputed fact must be of controlling importance to the case. *See Crete Carrier Corp. v. United States*, 577 F.2d 49, 51–52 (8th Cir. 1978).

Petitioner Simmons undertook to present written evidence on the competition issue, and we do not understand petitioners to be contending for oral presentation of his testimony. Hence, we believe that the conduct of this case procedurally by the Commission was correct and lawful.

The decision of the Commission is therefore AFFIRMED and the petition for review is DISMISSED.