247 F.3d 437 (2nd Cir. 2001)
 ERIE-NIAGARA RAIL STEERING COMMITTEE, NATIONAL LIME & STONE COMPANY, THE NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE, WYANDOT DOLOMITE, INC., INDIANA RAIL ROAD COMPANY, INDIANAPOLIS POWER & LIGHT COMPANY, Petitioners,
v.
SURFACE TRANSPORTATION BOARD, UNITED STATES OF AMERICA, CSX CORPORATION, CSX TRANSPORTATION, INC., Respondents,
NORFOLK SOUTHERN CORPORATION, NORFOLK SOUTHERN RAILWAY COMPANY, NEW YORK STATE DEPARTMENT OF TRANSPORTATION, THE FERTILIZER INSTITUTE, INDIANAPOLIS POWER & LIGHT COMPANY, Intervenors.
 Docket Nos. 98-4285(L), 98-4358(CON), 98-4362(CON), 98-4375(CON), 98-4385 (CON), 98-4393(CON), 98-4127(CON)
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: February 5, 2001
Decided: April 25, 2001
 
 Petitions for review of the orders of the Surface Transportation Board approving, with conditions, the acquisition and division of Consolidated Rail Corporation's assets by CSX Transportation, Inc. and Norfolk Southern Railway Company.
 Petitions for review denied.
 FREDERIC L. WOOD, Thompson Hine & Flory LLP, Washington, DC (John K. Maser III, Thompson Hine & Flory LLP; Eliot Spitzer, Attorney General of the State of New York; Harry First and Richard L. Schwartz, Office of the Attorney General, Antitrust Bureau, NY, on the brief) (for petitioner Erie-Niagra Rail Steering Committee and intervenor New York State Department of Transportation)
 CLARK EVANS DOWNS, Jones, Day, Reavis & Pogue, Washington, DC and KEITH G. O'BRIEN, Rea, Cross & Auchincloss, Washington, DC (Kenneth B. Driver, Jones, Day, Reavis & Pogue, Washington, DC; Barry R. Satine, Jones Day, Reavis & Pogue, New York, NY; John D. Heffner, Rea, Cross & Auchincloss, Washington, DC, on the brief) (for petitioners National Lime & Stone Company and Wyandot Dolomite, Inc.)
 JEFFREY O. MORENO, Thompson Hine & Flory LLP, Washington, DC (Frederic L. Wood and Nicholas J. DiMichael, on the brief) (for petitioner The National Industrial Transportation League and intervenor The Fertilizer Institute)
 JOHN H. BROADLEY, John H. Broadley & Associates, P.C., Washington, DC (for petitioner Indiana Rail Road Company)
 MICHAEL F. MCBRIDE, LeBoeuf, Lamb, Green & MacRae, L.L.P., Washington, DC (Bruce W. Neely, on the brief) (for petitioner and intervenor Indianapolis Power & Light Company)
 LOUIS MACKALL, V, Attorney, Surface Transportation Board, Washington, DC (Ellen D. Hanson, General Counsel, Surface Transportation Board; Joel I. Klein, Assistant Attorney General, United States; Robert B. Nicholson and John P. Fonte, Attorneys, United States Department of Justice, Washington, DC, on the brief) (for respondents Surface Transportation Board and United States)
 DENNIS LYONS, Arnold & Porter, Washington, DC (Richard L. Rosen and Sharon L. Taylor, Arnold & Porter, Washington, DC; Mark G. Aron and Peter J. Shudtz, CSX Corporation, Richmond, VA; P. Michael Giftos and Paul R. Hitchcock, CSX Transportation, Inc., Jacksonville, FL; Samuel M. Sipe, Jr. and David H. Coburn, Steptoe & Johnson LLP, Washington, DC, on the brief) (for respondents CSX Corporation and CSX Transportation, Inc.)
 RICHARD A. ALLEN, Zuckert, Scoutt & Rasenberger, LLP, Washington, DC (Scott M. Zimmerman, Zuckert, Scoutt & Rasenberger, LLP, Washington, DC; J. Gary Lane, George A. Aspatore, Greg E. Summy, and John V. Edwards, Norfolk Southern Corporation, Norfolk, VA, on the brief) (for intervenors Norfolk Southern Corporation and Norfolk Southern Railway Company)
 Before: JACOBS, SOTOMAYOR, Circuit Judges, and COTE, District Judge.*
 JACOBS, Circuit Judge:
 
 
 1
 Two major railroads, CSX Transportation, Inc. (CSX) and Norfolk Southern Railway Company (NS), have applied to the Surface Transportation Board (STB) for approval of a transaction by which they would acquire and divide the assets of a third major railroad, Consolidated Rail Corporation (Conrail). The STB, which has oversight jurisdiction concerning such transactions, see 49 U.S.C. §§ 11321-26, approved the transaction, but in response to comments by a wide range of affected entities, imposed conditions on the transaction. See CSX Corp., Decision No. 89, Docket No. 33388, 1998 WL 456510 (Surface Transp. Bd. July 20, 1998) (hereinafter "Decision No. 89"). Various concerned entities were then given the opportunity to apply for clarification or modification of the decision, and many elected to do so.
 
 
 2
 By and large, the STB preserved Decision No. 89, but did make some modifications in response to several of the applications. This appeal is taken by petitioners and intervenors who assert continuing objections to Decision No. 89 and the ensuing related decisions. See CSX Corp., Decision No. 93, 1998 WL 560256 (Surface Transp. Bd. Sept. 1, 1998); CSX Corp., Decision No. 96 (unpublished) (Surface Transp. Bd. Oct. 19, 1998); CSX Corp., Decision No. 115, 1999 WL 55119 (Surface Transp. Bd. Feb. 5, 1999); CSX Corp., Decision No. 125, 1999 WL 320718 (Surface Transp. Bd. May 19, 1999) (all in STB Finance Docket No. 33388, all hereinafter referenced by decision number).[1] We conclude that the STB did not abuse its considerable discretion, and we therefore deny the petitions for review.
 
 
 3
 On this appeal, eight petitioners and intervenors raise a variety of objections to the STB's decisions. The facts that bear upon the objections generally are set forth in the following Background section; facts that bear upon the individual claims are considered in the body of the opinion.
 
 BACKGROUND
 
 4
 Conrail was a major rail carrier in the Northeast and Great Lakes region, formed by a series of mergers of smaller rail lines over a period of years. CSX, a major rival rail carrier, initiated a buyout of Conrail; and NS, another major rail carrier, responded with a counter-proposal. The ensuing bidding war ended with CSX and NS agreeing to purchase Conrail jointly and to divide its assets between them.
 
 
 5
 In general, the asset transaction distributed Conrail's rail to either CSX or NS outright, but some track was subject to certain shared uses. In some instances one railroad was given formal ownership rights and the other was given "trackage rights," or the right, typically time-limited and for some set fee, to traverse the track. The parties also created "Shared Asset Areas" (SAA) in Northern New Jersey and New York, in Philadelphia, and in Detroit. In these SAAs, Conrail will continue to exist for the limited purpose of managing the rail network for the benefit of both NS and CSX, with both companies having the right to use the rails.
 
 
 6
 Completion of this transaction required the STB's approval. Before granting approval, the STB solicited comments from interested parties, and several thousand responded. The STB granted its approval, subject to certain conditions, see Decision No. 89, which require description only as they relate to the specific complaints detailed below. After the approval, various parties (including CSX and NS) petitioned for reconsideration and clarification of elements of the STB's decision. In a series of decisions, the STB made limited changes to Decision No. 89; four such subsequent decisions are also on appeal here (Decision Nos. 93, 96, 115, and 125), and will be further discussed in the context of the parties that appeal them.
 
 STANDARD OF REVIEW
 
 7
 The scope of this Court's power to review STB decisions is set out in 5 U.S.C. § 706. See, e.g., Western Coal Traffic League v. STB, 169 F.3d 775, 778 (D.C. Cir. 1999); Western Resources, Inc. v. STB, 109 F.3d 782, 785 (D.C. Cir. 1997); Mr. Sprout, Inc. v. United States, 8 F.3d 118, 122-23 (2d Cir. 1993). Section 706 provides:
 
 
 8
 To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
 
 
 9
 (1) compel agency action unlawfully withheld or unreasonably delayed; and
 
 
 10
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 
 
 11
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 
 
 12
 (B) contrary to constitutional right, power, privilege, or immunity;
 
 
 13
 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
 
 
 14
 (D) without observance of procedure required by law;
 
 
 15
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
 
 
 16
 (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
 
 
 17
 In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.
 
 
 18
 This Court's review of the decisions of the STB is deferential, as was our review of decisions of its predecessor, the Interstate Commerce Commission (ICC).[2] See, e.g., Zatz v. United States, 149 F.3d 144, 147 (2d Cir. 1998) (per curiam) (noting that we afford the STB "wide discretion"); Benmar Transp. & Leasing Corp. v. ICC, 623 F.2d 740, 743 (2d Cir. 1980) (holding that review of ICC decisions is "narrow"); Long Island R.R. Co. v. United States, 568 F.2d 254, 257 (2d Cir. 1977) (holding that review of ICC decisions is "extremely limited").
 
 
 19
 In this case, the parties' challenges are asserted primarily under ¶¶(2)(A) or (E) of §706. Our review under either subsection is particularly deferential. See Kulmer v. STB, 236 F.3d 1255, 1258 (10th Cir. 2001) ("Under § 706(2)[(A)]'s arbitrary-and-capricious standard, [courts] will reverse the STB only if there has been a 'clear error of judgment.'" (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971))); New York v. United States, 600 F.2d 349, 351 (2d Cir. 1979) (Under § 706(2)(E), "[e]vidence may be substantial without being weighted in favor of the Commission's holding. If it would justify a trial court in refusing to direct a verdict, it will withstand judicial scrutiny on review of the Commission's order." (citing Illinois Cent. R.R. Co. v. Norfolk & W. Ry. Co., 385 U.S. 57, 66 (1966))).
 
 DISCUSSION
 
 20
 We address the arguments raised by each petitioner and intervenor, in turn:A. The National Industrial Transportation League and The Fertilizer Institute
 
 
 21
 Two large associations of shippers--The National Industrial Transportation League (NITL) and The Fertilizer Institute (TFI; collectively, NITL/TFI)--interpose two challenges to the division of Conrail's assets set out in Decision No. 89: 1) that the high price paid for Conrail's assets after the bidding war between NS and CSX creates a significant risk that NS and CSX will use their new-found market power to raise rates for vulnerable customers; and 2) that the merger results in a reduction of origin competition that mandates additional protective conditions.
 
 
 22
 1) The bidding war between NS and CSX elevated Conrail's stock price from $71 to $115 per share. Eventually the two contestants agreed to split Conrail's assets, but agreed to pay on the basis of the final $115 bid, a total of $20.018 billion. According to NITL/TFI, the price includes an "acquisition premium" of either $11.6 billion (based on the difference between the purchase price and the book price of Conrail's assets) or $13.9 billion (based on the difference between the purchase price and the market price of Conrail's stock before the bidding war). NITL/TFI argue that this premium is especially troubling because the purchase price of the Conrail assets (including the component that NITL/TFI characterize as the acquisition premium) is a factor in determining the rate threshold at which the STB can assume rate-regulatory power over CSX and NS. See, e.g., 49 U.S.C. §§ 10701(d)(1), 10707 (authorizing the STB to ensure that rail rates are "reasonable" only when a carrier is "market dominant"; setting out calculation for determination of market dominance); Decision No. 89 n.95 (acknowledging that the purchase price of the assets will play a role in determining jurisdictional threshold for rate regulation). NITL/TFI seek conditions that limit the ability of NS and CSX to recapture the premium by raising rates.
 
 
 23
 The STB argues that the price paid was not excessive because the actual purchase price of a rail asset, negotiated at arm's length, best reflects the asset's actual value. Accordingly, the difference between i) the book value of Conrail's assets or original market value of its stock and ii) the purchase price of Conrail is not a premium above actual value; rather it simply demonstrates that the actual value of Conrail had previously been underestimated.
 
 
 24
 In valuing rail assets the STB is statutorily required to conform its accounting rules to generally accepted accounting principles "[t]o the maximum extent practicable." 49 U.S.C. §§ 11142, 11161; see also id. § 11164. Consistent with GAAP principles, for over ten years the STB has used acquisition costs, see Railroad Revenue Adequacy, 1988 Determination, 6 I.C.C.2d 933, 940 (1990), a valuation that has been upheld by the courts. See Association of Am. Railroads v. ICC, 978 F.2d 737, 740-41 (D.C. Cir. 1992) (upholding acquisition cost, noting that the ICC is at "the zenith of its powers" when determining how to value rail assets).
 
 
 25
 We agree with the STB's view that Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591 (1944), is inapplicable here. Hope held that the Federal Power Commission properly rejected the use of market value in setting rates in the heavily regulated natural gas industry, because the use of such a value created a circularity problem. See id. at 601. That is, market value would be inherently inaccurate as an independent valuation of the company because an essential component of the company's value, future earnings, was dependant on the level of the very same regulated rates.
 
 
 26
 Here, by contrast, the STB determined that the railroad industry is not a heavily regulated industry and that "[g]iven that very few rail shippers are captive shippers whose rates ever require regulatory intervention, paying too much for property in hopes of extracting increased rents would be a self-defeating strategy in the rail industry." This conclusion is reasonable and entitled to deference. See Association of Am. Railroads v. ICC, 978 F.2d at 741-42 (holding Hope inapplicable on similar ground).
 
 
 27
 In any event, the STB performed an extensive analysis, using worst-case scenarios, and determined that even if no efficiencies were captured by this transaction, the thresholds for rate regulation would only rise 7.26% for NS and 4.9% for CSX. Moreover, the STB held that any effects of the acquisition premium on the STB's regulatory activities would be monitored for a period of five years as part of the STB's oversight process, and that it was retaining jurisdiction "to impose additional conditions if, and to the extent, [it] determine[s] that additional conditions are necessary to address unforseen harms caused by the transaction."
 
 
 28
 For these reasons, the STB's decision to deny NITL/TFI additional relief was supported by substantial evidence and was neither arbitrary nor capricious.
 
 
 29
 2) Some shippers are served by several originating rail lines, but ship to customers that have access to a single rail line only. As a result of the Conrail transaction, there will be instances in which NS or CSX, who had been a delivery monopolist, will now also enjoy a monopoly over the originating traffic (or vice versa).
 
 
 30
 The STB argues that such a circumstance confers no incremental market power, because, under the so-called one-lump theory, there is a "lump" of maximum available profit for any given delivery route. If a single rail line operates on that route, that railroad can capture the whole lump; and by the same token, if several originating lines feed into one delivering line, any rate reduction the shipper realizes by competition at the origin is simply absorbed on the delivery end. Therefore, even if the delivery monopolist becomes a monopolist over the entire route, the carrier cannot increase profit by increasing the total rates charged on the shipment. The STB's reliance on the one-lump theory has been upheld by the District of Columbia Circuit. See Western Resources, 109 F.3d at 786-793.
 
 
 31
 NITL/TFI's challenge to the theory itself, presented to the STB, is not renewed on appeal. NITL/TFI's appellate argument is narrower. The STB ordinarily considers a shipper's challenges to a carrier's rate on a "through" basis (i.e., from origin to destination). However, under a "contract exception," shippers can challenge rates on the bottlenecked segment of a route if the shipper has separately contracted for the non-bottlenecked portion. Because, in some circumstances, the consolidation of Conrail's assets with the assets of NS and CSX confers on them "through" monopolies where they had had partial monopolies only, affected shippers will lose the ability to challenge certain rates under the contract exception. This effect, according to NITL/TFI, would "adversely affect competition, since it would deprive the shipper of an existing regulatory remedy."
 
 
 32
 This argument, however, was not presented to the STB. We are therefore without the benefit of an STB decision addressed to this argument, and have no record evidence from shippers claiming the harm NITL/TFI assert is possible. Accordingly, we decline to address the merits of this argument. See, e.g., United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 34-37 (1952) (holding that issues not raised before the reviewing agency generally cannot be raised on appeal).
 
 
 33
 B. Erie Niagara Rail Steering Committee and New York State Department of Transportation
 
 
 34
 The Erie Niagara Rail Steering Committee is an ad hoc committee, composed of railroad shippers, economic and industrial development organizations, public transportation representatives, and local government representatives, and is joined in this appeal by the New York State Department of Transportation (collectively, "Erie Niagara"). Erie Niagara is promoting the commercial interests in these proceedings of the Niagara Frontier region of New York, which consists of Erie and Niagara counties and the northwest portion of Chautauqua. Several rail carriers operate in the region, but Conrail owned the most profitable stations and was by far dominant. Before Conrail consolidated a dominant position, the Niagara Frontier region was served by six smaller rail carriers. In the proceedings before the STB, Erie Niagara sought restoration of what it claimed was the more vigorous competition that existed prior to the creation of Conrail.
 
 
 35
 Under the transaction at issue: CSX controls the major lines running along Lake Erie from Cleveland to Buffalo, the lines from Albany to Buffalo, the lines from Albany to New York, and the lines running north from Buffalo and Albany into Canada; and NS controls the lines running from New York City to Buffalo (through New Jersey and Pennsylvania), and has trackage rights in the Buffalo area sufficient to connect with Canadian carriers, but insufficient to serve local customers in the Niagara Falls area. According to Erie Niagara, this arrangement gives CSX a near monopoly over the rail traffic affecting the commercial life of the Niagara Frontier region, because even where NS is present in the market, it gives no competition to CSX.
 
 
 36
 Erie Niagara asked the STB to impose one of three conditions in the Niagara Frontier region: make the region a Shared Asset Area; grant CSX and NS reciprocal trackage rights there; or grant them reciprocal switching rights.
 
 
 37
 STB Decision No. 89 denied Erie Niagara relief for four principal reasons:
 
 
 38
 1) STB's responsibility to consider (and attempt to remedy) harm to competition does not entail the enhancement or maximization of competition.
 
 
 39
 2) In ascertaining harm to competition, the relevant comparison is between the rail market before and after the division of Conrail's assets, not between the rail market before Conrail's formation and after the division of its assets.
 
 
 40
 3) For some shippers, the transaction creates incremental competition between CSX and NS because both carriers have routes into Buffalo and out of Buffalo into Canada. Likewise, some of the shippers not served directly by both CSX and NS would nonetheless benefit collaterally, by rights to build out spur lines or by the availability of truck transport connecting the shipper to an alternate rail route.
 
 
 41
 4) The region will be the beneficiary of a settlement separately negotiated by NITL, in which CSX and NS agreed for a five-year period to drop switching charges to $250/car from the $390-$450/car rate charged by Conrail.
 
 
 42
 Although the STB denied Erie Niagara relief, it has undertaken a three-year study of the rail rates in the Niagara Frontier area to determine whether the changes effected by the division of Conrail's assets sufficiently preserve competition.
 
 
 43
 The question on appeal is whether the STB erred, under the applicable standard of review, by failing to take measures to enhance competition (as opposed to primarily preserving the pre-transaction level of competition) in the Niagara Frontier region.
 
 
 44
 In approving mergers and crafting conditions, the STB's statutory mandate is to prevent "adverse effect[s] on competition among rail carriers." 49 U.S.C. §11324(b)(5) (emphasis added). The improvement of competition is arguably subsumed within the STB's statutory obligation to consider "the effect of the proposed transaction on the adequacy of transportation to the public." 49 U.S.C. § 11324(b)(1). However, the STB conducted an extensive examination of the adequacy of public transportation and concluded on balance that that interest would not be served by an SAA in the Niagara Frontier region. The STB found that one reason Conrail was created in the first place was because many of the smaller rail lines absorbed by Conrail were not economically viable, and concluded therefore that restoration of pre-Conrail competitive conditions in the Niagara Frontier region would be undesirable. Moreover, in certain limited areas the STB did impose "procompetitive" conditions, including some conditions originally proposed by Erie Niagara.
 
 
 45
 Alternatively, Erie Niagara argues that the enhancement of competition should have been taken into account whether or not that consideration is specifically mandated by statute. Although the STB may consider factors not expressly mentioned in the statute, the STB has discretion to decide which unenumerated factors to consider. See Illinois v. ICC, 687 F.2d 1047, 1052 n.8 (7th Cir. 1982) (noting that "the Commission may decide what considerations beyond those specifically mentioned in the statute should be given weight"); cf. Gilbertville Trucking Co. v. United States, 371 U.S. 115, 127 (1962) (holding that "[t]he statute entrusts the Commission with the duty to decide what considerations other than those specifically mentioned in [the statute] shall be given weight," in a case concerning the ICC's authority under an analogous statute governing motor carrier mergers). Many parties petitioned for access to service by both CSX and NS, but the STB determined that the grant of all these requests would unacceptably reduce the financial incentives for the asset acquisition transaction. The STB's decision to create SAAs in some areas and not others was part of a balanced design (i) to protect competition and (ii) to preserve the benefits of the transaction, and was not arbitrary or capricious.
 
 C. Indianapolis Power & Light Company
 
 46
 Indianapolis Power & Light Company (IPL) provides electricity to metropolitan Indianapolis and steam to some parts of the city's downtown. This energy is produced by burning coal at two IPL plants--the Stout Plant and the Perry K Plant--which receive coal via rail. The cost of rail transportation is a major component of the cost of the coal.
 
 
 47
 The coal shipments to Stout and Perry K can originate from either Indiana Southern Railroad (ISRR) or Indiana Railroad (INRD). CSX was and is the majority shareholder of INRD. Before the division of Conrail's assets: coal for Perry K originated from ISRR or INRD was switched to Conrail's line, which served the Perry K Plant directly; and coal for Stout arrived via INRD, who owned the only track serving it directly. Thus, coal originating on ISRR reached Stout via an interchange with Conrail and switching with INRD. The Stout Plant enjoyed competitive freight costs because it could (if it chose) bypass INRD for ISRR-origin coal by building out a rail spur from the plant directly to Conrail's nearby rail line.
 
 
 48
 The original proposed transaction would have given CSX rights to the tracks and associated facilities formerly belonging to Conrail, including the nearby rail line to which Stout had the option to build-out, and would have granted NS certain limited trackage rights on that nearby line. IP&L claimed that this proposal placed it at the mercy of CSX and foreclosed opportunity of a competitive build-out to the former Conrail line, because CSX, the new owner of that line and INRD's majority shareholder, would not fill Conrail's role as a credible competitor to INRD.
 
 
 49
 IPL's only timely appeal challenges the STB's ruling in Decision No. 125 on the competitiveness of IPL's rail traffic as altered by Decision No. 89 and subsequent decisions.[3] As it now stands, CSX owns Conrail's former rail lines in the area, but by order of the STB, NS has trackage rights to the Stout Plant. See Decision No. 115. Decision No. 89 preserved a build-out option for IPL, notwithstanding CSX's ownership of the former Conrail line, through specific trackage rights: "[i]f a build out is constructed, we will permit NS or ISRR to serve IP&L. If ISRR is selected, it would receive trackage rights from its current connection with Conrail... to the build-out point...." Decision No. 125 reiterated the STB's intention to monitor IPL's rail options in continuing oversight proceedings, but denied IPL and additional relief.
 
 
 50
 IPL argues that the grant to NS of trackage rights directly into Stout will not provide effective competition for IPL's rail traffic, and that a build-out to railroads only possessing trackage rights on a rail line is not a competitive threat that is equivalent to the pre-transaction set-up. However, the record reflects that the STB took measures to maintain the competitiveness of rail traffic to IPL; it granted some of the remedies IPL requested, and preserved remaining issues for later oversight proceedings. It is unclear (i) what terms NS will be able to offer IPL for its business, and (ii) whether the threat of a build-out will continue to control the rates offered by CSX and INRD. We therefore conclude that any effort to craft additional remedies for IPL is premature and that this matter is best confided to the continuing oversight of the STB.
 
 D. Indiana Rail Road Company
 
 51
 The Indiana Rail Road Company (referenced above and below as INRD) is a small railroad that currently delivers all the coal used by IPL's Stout Plant. Before the division of Conrail's assets, Conrail switched coal to INRD. CSX now owns Conrail's lines in the area, and also owns 89% of INRD. INRD's president and minority shareholder sought intervention in this dispute on behalf of INRD following Decision No. 89, but intervention was denied by the STB in Decision No. 93. We review the STB's denial of a motion to intervene for abuse of discretion. See Tri-State Motor Transit Co. v. ICC, 739 F.2d 1373, 1374 n.1 (8th Cir. 1984); S.C. Loveland Co. v. United States, 534 F.2d 958, 960 n.1, 962 (D.C. Cir. 1976).
 
 
 52
 The STB denied INRD's motion primarily on the ground that INRD long delayed intervening even though it had had ample notice that it had a stake in the proceedings. Because INRD is affiliated with and controlled by a party to the proceeding (CSX), and because at least three parties (the Department of Justice, ISRR, and IPL) requested relief that plausibly impacted INRD's interests, the STB's decision to deny intervention was not an abuse of discretion.
 
 
 53
 Moreover, it is unclear how INRD is harmed by virtue of the STB's decisions. The STB ordered CSX to procure trackage rights over INRD's line for the benefit of NS, but has not ordered INRD itself to do anything. INRD emphasizes that CSX is INRD's majority shareholder, occupies a majority of the seats on INRD's board of directors, and has arranged for INRD to grant NS such rights, all of which, INRD suggests, may constitute a breach of fiduciary duty on the part of CSX. If so, however, that controversy is between CSX and INRD, and can be considered elsewhere without intervention in this proceeding.
 
 
 54
 E. National Lime and Stone Co. and Wyandot Dolomite, Inc.
 
 
 55
 National Lime and Stone Co. and Wyandot Dolomite, Inc. shipped limestone aggregate and industrial mineral products to their customers via Conrail through Ohio, Pennsylvania, and West Virginia. For certain shipments, Conrail acted as a "single rail carrier," receiving the shipments at origin and delivering them at their destination, and moving along its own tracks or utilizing its trackage rights, without the switching fees incurred by a shipper when one railroad hands its cargo off to another.
 
 
 56
 As a result of the division of Conrail's assets, CSX now owns most of the lines serving the mineral shippers' production facilities, while NS now owns most of the lines serving their customer base. The mineral shippers asked the STB to allow NS to serve as a single rail carrier for their shipments by requiring CSX to grant NS trackage rights to their production facilities.
 
 
 57
 Decision No. 89 acknowledges that the division of Conrail assets would result in two-line service on some routes that previously were served by a single line; on the whole, though, many more lines were consolidated than split, and the STB was generally reluctant to create too many trackage rights. In this case, however, the STB found that the special nature of mineral aggregate (it is too heavy for trucks and the profit margins are low) justified some relief. At oral argument before the STB and under a separate settlement, CSX and NS consented to (i) provide trackage rights for all "existing" aggregate shipments, (ii) retain current shipping rates for three years, and (iii) honor the terms of any Conrail contracts until they expire. See Decision No. 89 (confirming agreement). CSX and NS then petitioned for clarification of Decision No. 89, because the trackage- rights condition was subject to no time limitation. Over the objection of the mineral shippers, Decision No. 96 set a five-year limit on the trackage condition.
 
 
 58
 On appeal, the mineral shippers challenge as insufficient the trackage rights condition imposed by the STB because it (i) applies only to large shipments, (ii) applies only to shipments of aggregate, not to the other industrial mineral products shipped by these petitioners, and (iii) expires in five years.
 
 
 59
 The record shows that the STB carefully considered the requests of the mineral shippers, granted most of the measures they sought, and reserved oversight authority concerning rail service for that industry. The STB's decision to deny more extensive remedies at this time was not an abuse of discretion.
 
 CONCLUSION
 
 60
 Accordingly, all petitions for review are denied.
 
 
 
 NOTES:
 
 
 *
 The Honorable Denise Cote, United States District Court for the Southern District of New York, sitting by designation.
 
 
 [1]
 The parties have also referenced CSX Corp., Decision No. 3, Docket No. 33388 (Sub-No. 91), 2000 WL 1759450 (Surface Transp. Bd. Nov. 29, 2000), which is the subject of a separate appeal in the United States Court of Appeals for the District of Columbia Circuit and is not relied upon or challenged by any party to this appeal.
 
 
 [2]
 The STB replaced the ICC following the passage of the ICC Termination Act of 1995, Pub. L. No. 104 88, 109 Stat. 803 (1995). See Western Coal Traffic League v. STB, 169 F.3d 775, 778 n.3 (D.C. Cir. 1999). For the purposes of this appeal, there is no need to distinguish precedent that applies to the ICC from precedent dealing with the STB. See, e.g., id.
 
 
 [3]
 IPL also appeals the STB's refusal to afford IPL access to the trackage rights agreement between CSX and NS. It was disclosed at oral argument that IPL now has a copy of this agreement. So this issue is moot.