**WESTERN RESOURCES, INC., Petitioner,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents,**

**Santa Fe Pacific Corporation, et al., Intervenors.**

Nos. 95–1435, 95–1495, 95–1512, 95–1519, 95–1537 and 95–1543.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 10, 1997.

Decided March 28, 1997.

Rehearing Denied May 16, 1997.

ert D. Rosenberg, Patricia E. Kolesar and Charles F. Holum entered appearances.

Louis Mackall, V, Attorney, Surface Transportation Board, Washington, DC, argued the cause for respondents. With him on the brief were Henri F. Rush, General Counsel, Joel I. Klein, Acting Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and John P. Fonte, Attorneys. Catherine G. O'Sullivan, Attorney, entered an appearance.

Samuel M. Sipe, Jr., Washington, DC, argued the cause for intervenors. With him on the brief were Betty Jo Christian, Erika Z. Jones, Roy T. Englert, Jr., Adrian L. Steel, Jr., Richard E. Weicher and Michael E. Roper. Douglas J. Babb, Edmund W. Burke, Thomas J. Knapp, Timothy M. Walsh, Kathryn A. Kusske, Arvid E. Roach, II and John M. Hemmer entered appearances.

Before: WILLIAMS, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

On August 16, 1995 the Interstate Commerce Commission approved the merger of Burlington Northern, Inc. ("BN") and The Atchinson, Topeka and Santa Fe Railway Company ("Santa Fe"), two railways that serve the West with about 35,000 miles of track. *Burlington Northern Inc. & Burlington Northern R.R. Co.—Control & Merger—Santa Fe Pacific Corp. & The Atchison, Topeka & Santa Fe Ry. Co.*, Finance Docket No. 32549, Decision No. 38 (August 16, 1995) (hereinafter *"Burlington Northern"*). Although the Commission granted numerous requests for protective conditions by parties who claimed they would be harmed by the loss of competition between the two railways, it denied many others. The petitioners here—four electric utilities (SPS/TUCO, Western Resources, Houston Lighting, Arizona Electric), a utility trade association (Western Coal Traffic League), and a utility fuel-supply cooperative (Western Fuels)—complain that the merger will harm their (or their members') ability to ship coal from various mines to their utilities and thus that

Donald G. Avery, Frederic L. Wood and John H. LeSeur, Washington, DC, argued the cause for petitioners. With them on the joint briefs were Thomas W. Wilcox and C. Michael Loftus. Nicolas J. DiMichael, Andrew B. Kolesar, III, William L. Slover, Rob-

the Commission erred in denying their requests for trackage rights and rate caps.

The disputed aspects of the merger involve almost exclusively *vertical* integration. For the most part, BN and Santa Fe did not operate lines over the same or similar routes; rather Santa Fe, which has a monopoly on rail delivery of coal to most of the utilities bringing challenges here, linked up "end-to-end" with BN. As a result, the controversy before us largely revolves around the so-called "one-lump" theory—the proposition that there is only one monopoly rent to be "gained from the sale of an end-product." Phillip Areeda & Donald F. Turner, 3 *Antitrust Law* ¶ 725b, at 199 (1978). The theory posits that where the stage of production just before final sale is monopolized (and thus the end-stage producer is collecting the monopoly rent), the monopolist's upstream vertical integration (even if accompanied by monopolization of prior phases) will normally not affect the end-product customer adversely. The Commission relied on the theory to deny the requests and petitioners contest its application.

Besides the claims of uncured adverse effects on competition, one petitioner contends that the Commission's compressed briefing schedule deprived it of its procedural rights.

We find the Commission's findings as to competitive harm supported by substantial evidence, and we find that petitioner waived the procedural claims by failing to raise them before the Commission. Although the Commission has been abolished and replaced by the Surface Transportation Board,[1] we generally refer to the agency as the Commission, as it was known when it decided this case.

\* \* \*

BN and Santa Fe filed a merger application with the Commission on October 13, 1994. At the time the Commission had jurisdiction over the merger under 49 U.S.C. § 11343 and was guided by the procedures and standards set out in 49 U.S.C. §§ 11344–47.[2] Section 11344(c) requires that the Commission approve mergers that are consistent with the public interest. See *Penn–Central Merger Cases*, 389 U.S. 486, 498–99, 88 S.Ct. 602, 608–09, 19 L.Ed.2d 723 (1968); *Missouri–Kansas–Texas R.R. Co. v. United States*, 632 F.2d 392, 395 (5th Cir.1980). When the Commission evaluates a merger involving at least two class I railroads,[3] as is the case here, one of the five factors it must consider is "whether the proposed transaction would have an adverse effect on competition among rail carriers." *Former* 49 U.S.C. § 11344(b)(1)(E), *new* 49 U.S.C. § 11324(b)(5).[4] In determining the public interest, it balances the gains in operating efficiency and market capability that result from consolidation against any reduction in competition or harm to essential services. See 49 C.F.R. § 1180.1(c); *Southern Pacific Transp. Co. v. ICC*, 736 F.2d 708, 717 (D.C.Cir.1984). It also has the power to impose conditions upon proposed mergers to remedy any resulting harms, *former* 49 U.S.C. § 11344(c), *new* 49 U.S.C. § 11324(c), and its policy is to do so if necessary to cure a merger's anticompetitive effects on the public or to protect essential services for a connecting carrier, subject to various qualifications that are irrelevant here. *Railroad Consolidation Procedures*, 363 I.C.C. 784,

---

1. See ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804 (abolishing ICC); *id.* § 201, 109 Stat. at 933–34 (transferring functions to Board); *id.* § 204(c)(2), 109 Stat. at 942 (providing that suits against ICC are continued against Board where they relate to functions transferred to the Board); *id.* at § 102(a), 109 Stat. at 804, 838–39 (amending Subtitle IV of Title 49 to establish § 11323, which vests Board with authority over railroad mergers).

2. Although the ICC Termination Act of 1995 made minor changes in the wording of the agency's pertinent authority, *compare* former 49 U.S.C. § 11344(a) *with* new 49 U.S.C. § 11324(a), no party claims that the changes are of any significance to the present case.

3. Class I carriers are defined as "carriers having annual carrier operating revenues of $250 million or more...." 49 C.F.R. pt. 1201, subpt. A, general instr. 1–1(a).

4. The former version of this provision speaks of an adverse effect on competition "in the affected region" whereas the new version refers to competition "in the affected region or in the national rail system." The parties, however, do not contend that this makes any difference here.

788–89 (1981), *codified at* 49 C.F.R. § 1180.1(d).

BN and Santa Fe argued before the Commission that the proposed merger would benefit the public interest in a variety of ways. Among other things, single-line BN/Santa Fe rail service would result in significant operating efficiencies and cost reductions (estimated by the railways at a little under $500 million a year) and would create new competition for railroads, trucks, and water carriers in a number of regions. By contrast, a number of electric utility interests asserted the competitive harms to which we now turn.

### Horizontal Effects

■ We first address the only claim concerning horizontal aspects of the merger, which the Commission rejected because of defects in the petitioner's market definition. Without the broad definition urged by the petitioner, it was apparent that BN and Santa Fe competed only as to a single basin (indeed, a single coal mine), and petitioners do not press the issue of the diminution of competition there.

The Western Coal Traffic League is a trade association consisting of electric utilities that use rail carriers to transport coal from mines located west of the Mississippi River to their generating stations. The League argued before the Commission that the merger would reduce the number of class I carriers capable of originating coal (i.e., transporting coal starting at the minemouth) in the eight principal basins in Wyoming, Montana, Colorado, and New Mexico, from four to three and would dramatically increase market concentration. Verified Statement of Thomas D. Crowley at 4, 8, 10. It pointed to a 496–point increase in the Herfindahl–Hirschman Index (a standard measure of market concentration) from 4080 to 4576,

which the Justice Department regards as presumptively violating the antitrust laws. See *1992 Horizontal Merger Guidelines,* 57 Fed.Reg. 41552, 41558 (1992).

The Commission rejected the League's assumption that one could properly view the coal transportation market as encompassing those railways that operate in the eight main western coal basins. As the Commission noted, the quality and type of coal differs from region to region, so that it is far from self-evident that an electric utility could readily switch from, say, high-sulphur coal mined in the San Juan Basin to low-sulphur coal mined in the Powder River Basin. *Burlington Northern* at 69. At some price differentials, perhaps, the ability of power plants to substitute one type of coal for another is enough to make inter-basin competition viable, but the League offered almost no evidence of substitutability. It submitted a list of what it claimed were concrete examples of competition between coal mines located in different basins, see Joint Appendix at 317–18, but in only one of these instances does the utility appear to have gone beyond *soliciting* bids or expressing an interest in alternative sources. *Id.* at 318. In the one exception, the purchase was only of "test burn coal." *Id.* Though this market segmentation seems surprising, the League failed to undermine the Commission's finding. See 5 U.S.C. § 706(2)(E) (substantial evidence standard); *Illinois Central R.R. Co. v. Norfolk & Western Ry. Co.,* 385 U.S. 57, 66, 87 S.Ct. 255, 260–61, 17 L.Ed.2d 162 (1966); *Southern Pacific Transp. Co. v. ICC,* 736 F.2d 708, 714 (D.C.Cir.1984).[5]

Although the Commission ruled out petitioner's broad market definition, as we mentioned above, it did find one instance where BN and Santa Fe directly competed to originate coal from a mine in Colorado. *Burlington Northern* at 69. But that mine was also served by Southern Pacific ("SP"), so that after the merger there were two competitors left. *Id.* The Commission did not explicitly

---

5. Petitioners also point out that the Commission, in approving another merger under 49 U.S.C. §§ 11343–45, noted among the public benefits warranting approval that a single-line service in the Powder River Basin would compete with coal suppliers and transporters in "other regions." *Union Pacific Corp., Union Pacific R.R. Co. & Missouri Pacific R.R. Co.—Control—Chicago & North Western Transp. Co. & Chicago & North Western Ry. Co.,* Finance Docket No. 32133, De-

cision No. 25, *1995 WL 141757,* at *60 (I.C.C. Feb. 21, 1995). This benefit was only "indirect[ ]," however, and was one among numerous benefits cited by the Commission in a lengthy five-page, single-spaced discussion of the issue. We cannot conclude that the Commission's inquiry into competitive harm here was controlled by its passing reference to competition between the Powder River Basin and "other regions."

address the suitability of attaching conditions to protect competition in that one case, but neither has the League raised any specific objection to its failure to do so.

### Vertical Effects

█ The claims of the remaining five petitioners all involve vertical integration. In these cases two (or more) railways are capable of originating the coal (the "origin carriers"), but only one railway (the "destination carrier" or "bottleneck carrier") can transport it from some interchange point to the utility end-user.[6] Some of the witnesses refer to this as a "rat-tail" pattern. We are not sure whether users of the metaphor see the multiple-origin carriers as forming the thick body of the rat, the destination monopolist the thin tail, or derive it from the tapered character of a rat's tail, but we will use the handy label in any event.

Exhibit 1

## THE PROTOTYPICAL "RAT-TAIL" RAIL TRANSPORTATION SYSTEM

Rebuttal Verified Statement of Joseph P. Kalt at 45 ("Kalt V.S.").

In four out of five of these cases Santa Fe was (and remains) the destination carrier, and BN was one of the origin carriers. Thus Santa Fe was in the position of a monopolist

---

6. Traffic can move via a single-line route, meaning that a single carrier transports the coal from mine to electric generating station, or via a joint-line service, as it does here.

integrating vertically upstream, and the merger enabled it, say petitioners, to foreclose competition from the remaining independent origin carrier or carriers.

In the case of petitioner Arizona Electric Power Cooperative, Inc. ("Arizona Electric"), the configuration of railways is different but the rat-tail structure remains. Its generating station in Apache, New Mexico was served at destination by bottleneck carrier SP, with BN and Santa Fe as origin carriers. But a settlement agreement, entered into in connection with the merger, gave SP trackage rights that enabled it to originate coal in competition with BN/Santa Fe. The agreement thus cured the otherwise resulting horizontal problem. But it left SP able to provide single-line service, and thus, perhaps ironically, left open the claim that *SP* will be able to foreclose competition from BN/Santa Fe itself over the origin leg.

Here, as we have mentioned, the Commission rejected petitioners' claims based on the one-lump theory, which says that there is only one monopoly profit to be gained from the sale of an end-product or service (here the transportation of coal for use at an electric generating plant). Because a monopolist at the end stage of production is in a position to capture that entire profit, integration backwards upstream, even when accompanied by monopolization of the earlier stages (which hasn't happened here) normally does not enable it to raise the profit-maximizing price and thus inflicts no harm on the ultimate customer. See 3 Areeda & Turner, *Antitrust Law* ¶ 725b, at 199.

The Commission has consistently applied this theory to railway transportation:

[A] carrier with a destination monopoly will likely push the through rate as high as possible and keep the monopoly profits to itself by playing off competing connecting carriers against one another in setting divisions. That is, the through rate will be at the level maximizing net revenue for the traffic, subject to regulatory limits, and the destination carrier will establish favorable through service with the origin carrier willing to take the lowest division of the through rate for its segment of the movement.

*Burlington Northern* at 70 (quoting *Union Pacific Corp., Pacific Rail System, Inc., & Union Pacific R.R. Co.—Control—Missouri Pacific Corp. & Missouri Pacific R.R. Co.,* 366 I.C.C. 462, 538 (1982)). Thus, if the theory is both correct and applicable, the merger would have no adverse effect on shippers even if the resulting single-line rail carrier (BN/Santa Fe in four out of five cases, SP in the fifth) were to foreclose competition from the remaining independent origin carrier or carriers.

We first note that the Commission rejected the petitioners' prediction that the consolidated BN/Santa Fe railway would bar unaffiliated origin carriers from participating in traffic movements, regardless of their relative efficiencies. It reasoned that if an independent origin carrier could transport coal at a lower incremental cost, then the bottleneck railway would have an incentive to choose that carrier over its own, affiliated carrier, just as firms in the rest of the economy make "make or buy" decisions for all elements of their production. *Burlington Northern* at 74. Petitioners point to nothing that calls this conclusion into question. Moreover, we note that to the extent that single-line transportation is more efficient, or eliminates misjudgments due to imperfect information and strategic behavior, the merger will likely lead to a reduction in the bottleneck carrier's profit-maximizing price. See 3 Areeda & Turner ¶¶ 725c & 725d.

The one-lump theory says that end-use customers will be no worse off even if the backward-integrating monopolist extends its monopoly to the upstream phase. Here the Commission found that there was no reason to think that the fatal "foreclosure" foretold by petitioners would occur. Thus it may not have been necessary for the Commission to rely on the one-lump theory at all, as the origin legs will probably not be monopolized. Nonetheless, the Commission went on to do so, and so shall we. With limited exceptions, our discussion assumes that the origin-only carrier may wither away.

The Commission does not treat the one-lump theory as an absolute, precluding the possibility of adverse effects from vertical integration in the rat-tail context. It regards

the theory as strong enough to create a presumption of bottleneck maximization of monopoly profits, subject to rebuttal:

> The record must clearly show the following in order for a nonmerging carrier to qualify for a grant of trackage rights to a utility over the line of the destination monopoly carrier. First, it must show that, prior to the merger, the benefits of origin competition flowed through to the utility and were not captured by the destination monopoly carrier. Second, if it is established that the benefits of origin competition are in fact passed on to the utility, there must be an additional showing that such a competitive flow-through will be significantly curtailed by the merger.

*Burlington Northern* at 71 (quoting *Union Pacific Corp., Union Pacific R.R. Co., & Missouri Pacific R.R. Co.—Control—Missouri–Kansas–Texas R.R. Co., et al.,* 4 I.C.C.2d 409, 476 (1988)).

Petitioners came forward with a number of rebuttal claims. We address first the objections that if valid would apply across the board, then the utility-specific objections based on empirical evidence.

### General Rebuttal Claims

The first objection is a procedural one posed by the Western Fuels Service Corporation. It asserts that the Commission's use of the theory to create a presumption improperly reversed the burden of proof, forcing the utilities rather than the Commission to come forward with evidence of competitive harm. But the Commission relied on a broadly accepted economic proposition, whose internal logic and predictive power petitioners did not, as a general matter, contest. The use of presumptions that capture reality in the general run of cases enables the Commission to do its work efficiently, and we have, on a number of occasions, approved its reliance on them. See *Atchison, T. & S.F. Ry. Co. v. ICC,* 580 F.2d 623, 630–31 (D.C.Cir.1978); see also *Associated Gas Distributors v. FERC,* 824 F.2d 981, 1008 (D.C.Cir.1987) ("Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall.")

A more promising claim is petitioners' assertion of a recognized exception to the one-lump theory, namely the exception for a regulated monopolist's vertical integration into an unregulated area. Areeda & Turner, 3 *Antitrust Law* ¶ 726, at 217. Integration by an end-stage regulated monopolist may enable it to evade the applicable regulation. In Areeda & Turner's example, a regulated gasoline pipeline that integrates backward into refining acquires the ability to charge inflated prices to its captive customers, without any check from a regulatory agency with jurisdiction solely over the rates for the pipeline's transportation service. *Id.*; cf. *Lamoille Valley R.R. Co. v. ICC,* 711 F.2d 295, 318 (D.C.Cir.1983).

This classic example is, of course, not directly applicable to integration *within* the railway industry. Rates for those segments in which a railroad has "market dominance," which petitioners believe to be the case here, would be subject to regulation (formerly by the Commission, now by the Board). See *former* 49 U.S.C. § 10709, *new* 49 U.S.C. § 10707; *Midtec Paper Corp. v. United States,* 857 F.2d 1487, 1506 (D.C.Cir.1988). Thus the integration is within the regulated industry, rather than straddling regulated and unregulated. But petitioners sketch a scenario, not a priori implausible, under which the backward vertical integration here would bring about adverse effects.

They suggest a case where the cost of transporting coal is a half cent per ton-mile. (Petitioners do not specify whether this is average or incremental cost, and for the example it appears to make no difference.) The origin segment is 900 miles and is served by two competing railroads, whereas the destination segment is 100 miles and is served by a monopolist. Petitioners assume that utilities are willing to pay $20 per ton for the entire trip and that up to $20 their demand is completely inelastic, meaning that they will not buy more or less if the price changes. At $20.01 or higher, however, the demand for railway transportation disappears altogether.

Without regulation the railroads can collectively charge $20.00, and, under the one-lump theory, the utility (or the destination rail-

road) bargains the origin railroads down to cost plus some trifle (i.e., $4.50); the destination railroad charges $20 minus the origin-line cost. After a merger, the utility pays the same $20 to the newly consolidated railroad.

Petitioners then introduce regulation, in the form of a regulated ceiling calculated at 200% of cost, or one cent per ton-mile. Pre-merger, the utility bargains the origin railroads down to cost (or $4.50), and pays the destination railroad the regulated ceiling, or $1, for a total of $5.50. Post-merger, the utility must pay the one-cent-per-ton-mile rate for the entire 1,000 miles, for a total charge of $10.00.

The flaw with petitioners' argument is that railway regulation does not function as they describe it. Rates for origin-to-destination service requiring more than one rail carrier are typically joint or proportional. A joint rate is one arrived at through mutual agreement between the participating carriers; a proportional rate is one offered by an individual carrier for its portion of a through movement, and is contingent on movement of the commodity by another carrier for the other leg(s) of the journey. See *Central Power & Light Co. v. Southern Pacific Transportation Co.*, No. 41242, at 2 & n.3 (S.T.B. Dec. 27, 1996), *appeal filed*, No. 97–1081 (8th Cir. Jan. 9, 1997) ("*Central Power & Light*"); *Great Northern Ry. Co. v. Sullivan*, 294 U.S. 458, 460, 55 S.Ct. 472, 473, 79 L.Ed. 992 (1935). Shippers (electric utilities here), if charged either a joint or proportional rate, must challenge the rate for the *entire* through movement; they cannot challenge individual segments. See *Central Power & Light* at 11. The maximum reasonable rate for coal transportation is therefore set for the entire movement from mine to power plant, with the division between carriers subject to separate regulatory constraints. The regulatory ceiling will therefore be roughly the same, regardless of whether the coal movement is single-line . or joint-line. See *Burlington Northern* at 76 (citing *Union Pacific—Control—Missouri Pacific; Western Pacific*, 366

I.C.C. 462, 541 (1982)).[7] Within the framework of petitioners' hypothetical, then, the regulated ceiling would be $10.00 both before and after the merger.

Petitioners try to use the Board's recent holding in *Central Power* to their advantage. There shippers claimed that, although the Board could not review the individual legs of joint rates, it could do so for proportional rates; and that even if it couldn't review the separate legs of a proportional rate for purposes of ordering reparations, it could for purposes of prescribing future rates. The Board rejected both claims. *Central Power* at 11–13. Thus, as a general matter, it thoroughly confirmed the regulatory premise that had served as the basis for rejecting the utilities' one-lump rebuttal arguments. It did, however, as petitioners note, recognize an exception. If one segment of a proportional rate were embodied in a contract between shipper and carrier, that rate would be immune to Board scrutiny under 49 U.S.C. § 10709(c)(1), formerly 49 U.S.C. § 10713(i)(1). In those circumstances the Board would review the reasonableness of the rate only for the non-contract leg of the journey.

Petitioners offer no reason why, in evaluating the role of rate regulation, the tail of this potential exception should wag the dog of the Board's general practice. Historically rates for the movement of petitioners' coal have been set in long-term contracts between the individual utilities and all of the rail carriers that participate in a particular through movement; on those facts, the contract exception would apply, but it would apply to *all* components of the rate, and the petitioners would be precluded from seeking rate relief over both the competitive and the bottleneck legs of the journey. Petitioners have been unable to point to a single instance of a transaction that would trigger the *Central Power* exception, that is, a published rate combined with a contract rate; a bottleneck carrier, of course, would have every incentive to avoid such a scenario.

7. Minor variations are possible due to the nature of the rate constraints imposed by the agency and set forth in the *Coal Rate Guidelines, Nation-* *wide*, 1 I.C.C.2d 520 (1985), *aff'd sub nom. Consolidated Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir.1987).

Further, if the disadvantaged origin carrier remains in competition for the origin service (as the Commission, rejecting petitioners' foreclosure theory, thought most likely), the creation of single-line service in these five rat-tail situations appears to leave shippers with the same ability to obtain separate-leg rate regulation that they had before. To the extent that shippers are able to use bargaining with carriers on the competitive origin legs to drive rates down to cost (as both the one-lump theory and petitioners' analysis assume), they should also be able to embed the resulting agreement with the disadvantaged origin carrier in a contract, thus eliciting separate Board review of the destination-leg rate. In any event, bearing in mind the historical absence of separately tariffed rates, and the absence of a showing that the merger increases their probability, we think the petitioners have failed to put forward any version of the regulatory exception that undercuts the Board's reliance on the one-lump theory.

Individual petitioners object to the application of the one-lump theory for additional reasons (independent of the reasons already described and the allegedly contrary empirical evidence that we address below). Southwestern Public Service Company and TUCO, Inc. ("SPS/TUCO") claims that since before the merger BN and Union Pacific ("UP") were the only carriers capable of originating Powder River Basin coal, Santa Fe, as a destination carrier, "depend[ed]" on them to provide coal to utility customers, including but not limited to SPS/TUCO. Dependence, according to SPS/TUCO, induced Santa Fe to "cooperate" with BN and UP, which entailed passing on their rate reductions to utilities. As the Commission found, however, real cooperation with BN and UP on the part of Santa Fe would be sharing the monopoly profit with them, not allowing utilities to benefit from rate reduction. *Burlington Northern* at 74–75. Further, the argument seems to have the notion of dependence backwards. Santa Fe was the monopolist, and the two competing origin carriers were surely more dependent on it than it was on either one of them. And they, by hypothesis, would have no monopoly rents to share with anyone.

Lastly, Western Fuels claims that before the merger Santa Fe did not have perfect information, either as to the price that utilities were willing to pay for coal transportation or as to the origin carriers' actual costs. It argues that the utility has better knowledge of its generating costs, electricity markets, and maximum price for coal, and consequently will have had an advantage in bargaining with Santa Fe.

This argument leaves us baffled. First, assuming that the utility's information on its costs and markets is superior and its advantage there enables it to drive a better bargain, Western Fuels has identified no change brought about by the merger; the utility will still have that advantage, to exactly the same degree. As to better information about transportation costs over the origin line, this will simply permit BN/Santa Fe to appropriate more of the monopoly profit for itself rather than sharing some of it with origin carriers. In fact, if the origin carriers successfully bluffed in the past and secured above-cost compensation, after the merger, BN/Santa Fe will recognize that the actual cost of origin traffic is lower; as a rational monopolist it will increase its profit by lowering prices and increasing output, to the benefit of shippers. See Areeda & Turner, 3 *Antitrust Law* ¶ 725c.

*Utility–Specific Rebuttal Claims*

Petitioners also have produced evidence of pricing behavior that, in their view, shows they enjoyed the benefits of origin competition before the merger. The evidence comes in two forms, Santa Fe's rate-setting strategy, which according to petitioners was not designed to capture the entire "lump" of monopoly profit, and reductions in coal traffic rates over time. An intrinsic difficulty with this attempt to rebut the one-lump theory is the conspicuous absence of any supporting theory. The pricing evidence was not marshalled to support an explanation for why a bottleneck carrier would allow the benefit of competitive origin rates to flow through to shippers. It may not take a theory to beat a theory, but it helps. The lore of classic economics methodology says that a theory is

to be rejected "if its predictions are contradicted ('frequently' or more often than predictions from an alternative hypothesis)." Milton Friedman, *Essays in Positive Economics* 9 (1953). But cf. D.N. McCloskey, *The Rhetoric of Economics* 1–35 (1985) (asserting that prediction and falsification are impossible and that, in any event, knowledge advances primarily through conversation among practitioners or "rhetoric"). Here petitioners offer no alternative hypothesis, and their efforts to contradict the one-lump theory are confounded by the multiplicity of real-world variables. The presence or absence of origin competition cannot be isolated from conditions such as a decline in demand for Powder River Basin coal, factors that could independently explain the decline in coal transportation rates. As we describe in greater detail below, BN/Santa Fe countered every example seeming to associate low through rates with origin competition with an explanation consistent with bottleneck capture of monopoly profit. Faced with a choice between a theory-less reading of the data, and a reading that fitted together various complementary theories, the Commission understandably chose the latter.

According to SPS/TUCO, Western Resources, Inc. and the Houston Lighting and Power Company, Santa Fe's rate-setting behavior demonstrated that it did not act to capture monopoly profits. SPS/TUCO and Western Resources say that Santa Fe independently determined its rate, which, after competitive bidding between origin carriers, was simply tacked on to that of the origin line. They invite us to infer that because Santa Fe did not raise its rates when competition drove the origin rates down, it did not act as the one-lump theory would predict. Similarly, Houston Lighting states that its contracts for incremental traffic, i.e., extra coal tonnage over and above that covered by its "base contract," showed rate reductions because of the downward pressure of competition between the origin railways and a static Santa Fe charge. Here the argument is that where the rents on the coal traffic were smaller (presumably utility demand for incremental traffic is more elastic because it is used to generate power for marginal uses), the one-lump theory would lead one to expect the bottleneck railroad's rate to decline; the origin carriers' rates should already have been driven down to cost.

Such behavior, however, is consistent with the one-lump theory. As the Commission reasoned, a perfectly rational strategy for a bottleneck carrier is to set a rate equal to the profit-maximizing lump it *thinks* can be realized, and let the origin carriers adapt. *Burlington Northern* at 76. As a bottleneck carrier does not have perfect information about the cost of moving coal over the origin segment, the best it can do is estimate its monopoly lump and see whether origin carriers will compete to handle traffic. If the bottleneck's price is too high, no bid the origin carrier can afford to make will be acceptable to the shipper. This form of rate setting is one means of eliciting cost information. Kalt V.S. at 78–81.

SPS/TUCO, Western Resources, Houston Lighting, Western Fuels, and Arizona Electric all allege that they obtained significant savings on coal transportation rates because of origin carrier competition. The strongest evidence of rate reduction is to be found in SPS/TUCO's base contracts. SPS/TUCO operates the Harrington Station in Amarillo, Texas and the Tolk Station, located about a hundred miles to the south. Each of those stations burns coal mined in the Powder River Basin ("PRB"), which before the merger could be shipped to the Harrington Station either via a BN single-line service or via a UP–Santa Fe joint-line service, but must travel the remaining hundred miles to the Tolk Station via Santa Fe. Since the Commission granted SP trackage rights to the Harrington Station when it approved the merger (thus preserving competition all the way from minemouth to utility), petitioners allege only that the Tolk Station suffered competitive harm. (SP trackage rights are not indicated in Exhibit 2.)

## Exhibit 2

Joint Brief for Petitioners at 50.

In 1984 SPS/TUCO entered into a base contract with BN and Santa Fe for transportation to the Tolk Station. SPS/TUCO claims that the competition between BN and UP, the newcomer railway company that began to serve mines in the PRB at that time, forced BN to reduce its rates by over $4.00 per ton, saving SPS/TUCO well over $128 million.[8] To the extent that the utilities argue that the very fact of *bargaining* with the upstream railroads contradicts the one-lump thesis, they are obviously wrong; the one-lump theory *assumes* that the utility or bottleneck monopolist will bargain their rates down to the competitive minimum.

The more interesting question is why the bottleneck carrier allowed the rate decline on the upstream leg to be passed through to the shipper. The merging railways pointed to a general decline in the delivered price of coal from the PRB, attributable to increasingly stiff competition from other fuel sources. *Burlington Northern* at 77; Kalt V.S. at 67–

73. This of course may be said simply to relocate the question: why did the fall in available rents hit the upstream carriers (whose rates had theoretically already been squeezed down to cost), rather than the bottleneck carrier? But that takes us back to the plausible pricing strategies of the bottleneck carrier. We have already seen that imperfect knowledge of the upstream carriers' costs means that upstream rate divisions may exceed costs and the bottleneck carrier may adopt a fixed rate strategy to elicit more information. In addition, the ability of SPS/TUCO to shift at least marginal generation from Tolk, where it was hostage to the bottleneck carrier Santa Fe, to Harrington, where it was not, gave SPS/TUCO leverage over Santa Fe. *Burlington Northern* at 78. But cf. Rebuttal Verified Statement of Bob N. Muncy at 6 (denying availability of significant extra capacity at Harrington). Thus the implications of the rate reduction evidence are at best ambiguous. Moreover, any infer-

8. Before the Commission, SPS/TUCO also represented that the Tolk Station enjoyed considerable savings due to UP–BN competition on an incremental contract negotiated in 1993. BN countered by arguing that the only "competition" was

between the rates it was willing to offer and natural gas rates. We do not address the issue because SPS/TUCO appears to have dropped it on appeal, referring in its brief only to the 1984 base contract.

ences in favor of the utilities appear to be outweighed by the evidence of the UP–Santa Fe joint-line, pre-merger bid to serve Harrington and Tolk in 1993. In that bid the unit rates demanded for the two competitive legs of the journey were substantially equal, and well below the rates sought by the bottleneck carrier on the Tolk traffic. Kalt V.S. at 85–87.

Western Resources, Western Fuels and Arizona Electric give accounts similar to that of SPS/TUCO, but they appear to add nothing distinctive, i.e., no evidence that is not dealt with by the explanatory theories advanced by the Commission and already discussed. Indeed, Arizona Electric qualifies its argument by claiming to have benefited from upstream competition only "to the limited extent afforded by the threat of regulatory review," Joint Brief for Petitioners at 68 n.52. But as we have seen, petitioners' argument that the regulatory context undermines the one-lump theory does not survive careful scrutiny of the real-world regulatory context.

Houston Lighting offered evidence that in 1990, 1991 and 1994 it had secured reduced rates for incremental loads from the PRB to its Parish Electric Generating Station, and Santa Fe, the bottleneck carrier, had siphoned off none of the rate reductions offered by the upstream carriers. See Verified Statement of L.G. Brackeen at 7–13. But here, besides the generally available explanations, there was the possibility of the utility's constructing a spur that could deprive Santa Fe of all Parish Electric coal traffic. Houston Lighting's ability to bypass Santa Fe by building a spur that would connect Parish with UP, one of its PRB origin carriers, gave Houston a powerful weapon against Santa Fe's attempts at monopoly pricing. *Burlington Northern* at 77. Houston Lighting takes the view that, since the spur could not possibly have been built in the two or three-year duration of the contracts, it could not have served as a bargaining stick when those contracts were being negotiated. But that imputes great short-sightedness to Santa Fe; pig-headed resistance to Houston's threat (unless it could be safely discounted as pure bluff) would lead to construction of the spur and a *permanent* loss of ability to enjoy any monopoly rents on the transaction. Nothing about the merger removes the possibility of a spur; it thus leaves Houston in full possession of this bargaining tool.

In sum, the Commission's efforts to reconcile the one-lump theory with the data adduced by petitioners are not implausible. On such a record we must say that the decision was supported by substantial evidence.

*Challenge to Commission's Procedure*

Western Resources contends that the Commission violated its procedural rights when it (1) failed to provide for an oral hearing before the Commission, a member of the Commission or an ALJ (other than four hours of oral argument before the Commission) or for cross-examination of witnesses before such an officer; and (2) did not allow in-house counsel access to certain highly confidential materials.

Western Resources argues that the Commission's procedures were deficient in light of the requirements of APA formal adjudication, 5 U.S.C. §§ 554, 556, 557, and constitutional due process. According to petitioner, the statutory hook that imports formal adjudication into railway merger proceedings, is former 49 U.S.C. § 11344(a), new 49 U.S.C. § 11324(a). It states, in relevant part, that the agency "shall hold a public hearing ... unless [it] determines that a public hearing is not necessary in the public interest." In view of the statute's express grant of discretion not to hold the public hearing at all, as well as the statistical and predictive nature of the issues before the Board, it seems doubtful that this language could require a full-fledged formal adjudicative hearing. See generally *Chemical Waste Management, Inc. v. EPA*, 873 F.2d 1477, 1482 (D.C.Cir.1989) (stating that a statutory requirement of a "hearing" does not give rise to a presumption of formal adjudication and that it is necessary to look to other factors). We cannot reach any of these issues, however, because Western Resources failed to raise either its APA or its constitutional argument before the Commission. See *United States v. L.A.*

*Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

\* \* \*

Accordingly, the petition for review is denied.

*So ordered.*