**WESTERN COAL TRAFFIC LEAGUE, et al., Petitioners,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents.**

**Union Pacific Corporation, et al., Intervenors.**

**No. 96–1373.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 11, 1998.

Decided March 23, 1999.

William L. Slover argued the cause for petitioners. With him on the joint briefs were C. Michael Loftus, John H. LeSeur, Christopher A. Mills and Andrew B. Kolesar, III.

Louis Mackall, V, Attorney, Surface Transportation Board, argued the cause for respondent. With him on the brief was Henri F. Rush, General Counsel. Robert B. Nicholson and John P. Fonte, Attorneys, U.S. Department of Justice, and Evelyn G. Kitay, Attorney, Surface Transportation Board, entered appearances.

Arvid E. Roach, II, argued the cause for intervenors. With him on the brief were J. Michael Hemmer and Carolyn F. Corwin. James V. Dolan and Louise A. Rinn entered appearances.

Before: WILLIAMS, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Western Coal Traffic League petitions for review of the Surface Transportation Board's order approving the merger of two major western railroads—the Union Pacific Railroad Company and the Southern Pacific Rail Corporation. In 1996, the Surface Transportation Board approved the merger application under the Interstate Commerce Act, 49 U.S.C. § 11343 *et seq.*, but imposed certain conditions. Western Coal Traffic League claims that the merger will have anticompetitive effects outweighing its benefits and

therefore argues that the Board erred in not denying the merger or requiring divestiture of certain lines. We conclude that the Board's actions were warranted, and deny the petitions for review.

## I. The Union Pacific/Southern Pacific Merger

On November 30, 1995, Union Pacific Corporation and Union Pacific Railroad Company ("UP") and Southern Pacific Rail Corporation ("SP") filed an application with the Surface Transportation Board ("STB" or "Board") for the acquisition of control of SP by a wholly owned UP subsidiary, and the subsequent consolidation of the rail operations of UP and SP. Because UP and SP ran side by side across much of the West, an unconditioned UP/SP merger would have reduced many shippers' options from two to one. To address this decrease in competition, UP and SP agreed in September 1995 to grant extensive "trackage rights" to the Burlington Northern and Santa Fe Railway Company ("BNSF").[1] That agreement was incorporated in the merger application. Several parties filed comments arguing that, even with the BNSF agreement, the merger would create reduced competition outweighing its benefits, and that the Board should refuse the merger or require divestiture of portions of SP's lines to other rail carriers. On August 12, 1996, the Board approved the merger. *See Union Pac. Corp., Union Pac. R.R., and Missouri Pac. R.R.—Control & Merger—Southern Pac. Rail Corp., Southern Pac. Transp. Co., St. Louis Southwestern Ry., SPCSL Corp., and The Denver and Rio Grande Western R.R.*, Finance Docket No. 32760, Decision No. 44, 1996 WL 467636 (STB Aug. 12, 1996) *("UP/SP")*. The Board found that the merger would result in better service and lower costs, and that these benefits outweighed any anticompetitive effects. *Id.* at 104. The Board further found that requiring divestiture of SP lines would ne-

gate many of the benefits of the merger. *Id.* at 156–64.

The Board did, however, impose a number of conditions on the merger in order to reduce potential anticompetitive effects. *Id.* at 144–56. First, the Board imposed conditions which originated in the settlement agreement between the applicants (UP and SP) and BNSF. Thus, the Board provided that any shippers who would go from having two directly serving railroads before the merger to one after the merger ("2–to–1 shippers") could be served by BNSF after the merger. *Id.* at 103, 145. This would be achieved by granting BNSF trackage rights over about 4,000 miles of UP and SP lines, and permitting all 2–to–1 shippers to open up existing contracts with UP and SP to ensure BNSF access to a traffic base. *Id.* at 146. With a few exceptions, the only existing shippers that BNSF would be allowed to serve would be 2–to–1 shippers, not other shippers on these lines. However, the Board gave BNSF the right to serve all new facilities on the UP and SP lines on which it obtained trackage rights. *Id.* at 145–46. In addition, the Board imposed a five-year oversight provision, allowing it to continue to monitor the impact of the merger and whether additional conditions were necessary. *Id.* at 146.

Western Coal Traffic League ("WCTL"), a trade organization representing electric utility companies interested in rail shipment of coal, petitions for review of the Board's decision.[2] WCTL participated in the STB proceedings, opposing the merger or alternatively seeking the imposition of additional conditions, such as divestiture of certain SP lines. In approving the merger, the Board rejected WCTL's arguments. WCTL claims that the Board erred in not denying the merger or requiring divestiture, arguing that the merger will have significant anticompetitive effects within the western coal transportation market.

---

1. The Burlington Northern Railroad and The Atchison, Topeka and Santa Fe Railway were previously separate entities. Their parent companies merged in 1995 with the approval of the Interstate Commerce Commission. *See Burlington Northern Inc.–Control & Merger–Santa Fe Pacific Corp.*, Finance Docket No. 32549, Decision No. 38, 1995 WL 528184 (ICC Aug. 23, 1995),

*aff'd sub nom. Western Resources, Inc. v. STB*, 109 F.3d 782 (D.C.Cir.1997) *and Grainbelt Corp. v. STB*, 109 F.3d 794 (D.C.Cir.1997).

2. Two additional petitioners, BNSF and the City of Reno, were involved in this case at the time of oral argument, but have since withdrawn their objections to the Board's decision.

## II. Western Coal Traffic League's Claims

### A. Background

The merger application of UP and SP was filed pursuant to the Interstate Commerce Act, 49 U.S.C. § 11343 *et seq.*, as in effect prior to the ICC Termination Act of 1995.[3] The statute provides that a merger is to be approved if "consistent with the public interest." *Former* 49 U.S.C. § 11344(c). *See Penn–Central Merger and N & W Inclusion Cases,* 389 U.S. 486, 498–99, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968); *Western Resources, Inc. v. STB,* 109 F.3d 782, 784 (D.C.Cir.1997). The Interstate Commerce Act includes a nonexhaustive list of factors to be considered in making the public interest determination, including "whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region." *Former* 49 U.S.C. § 11344(b)(1)(E). In determining the public interest, the Board balances the gains in operating efficiency against any reduction in competition or harm to essential services. *See* 49 C.F.R. § 1180.1(c); *Western Resources,* 109 F.3d at 784; *Southern Pac. Transp. Co. v. ICC,* 736 F.2d 708, 717 (D.C.Cir.1984).

The Board's balancing of the various competing interests under the public interest test is entitled to considerable deference. *See Southern Pac.,* 736 F.2d at 714; *Minneapolis & St. Louis Ry. v. United States,* 361 U.S. 173, 80 S.Ct. 229, 4 L.Ed.2d 223 (1959). The Supreme Court has observed that determining whether to approve a carrier consolidation is a complex task requiring considerable knowledge of the transportation industry, and that the wisdom and experience of the expert agency, not of the courts, must determine whether the proposed consolidation is consistent with the public interest. *McLean Trucking Co. v. United States,* 321 U.S. 67, 87–88, 64 S.Ct.

370, 88 L.Ed. 544 (1944). Nonetheless, although the Board's decision is entitled to substantial deference, we must set it aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if its findings of fact are unsupported by substantial evidence in the administrative record. 5 U.S.C. § 706; *Illinois Cent. R. R. v. Norfolk & Western Ry.,* 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); *Southern Pac.,* 736 F.2d at 714. We will not upset the Board's decision so long as it is "supported by substantial evidence in the record and was reached by reasoned decisionmaking." *Grainbelt Corp. v. STB,* 109 F.3d 794, 798–99 (D.C.Cir.1997).

WCTL argues that the merger was not consistent with the public interest and points to three principal difficulties with the Board's decision, all of which WCTL had argued before the Board. WCTL claims that (1) the merger would lead to duopoly pricing in the western coal market; (2) the merger would reduce source competition between UP-served mines in the Powder River Basin ("PRB") of Wyoming and Montana and SP-served mines in the Uinta Basin of Colorado and Utah; and (3) the settlement agreement between UP and BNSF will not serve competition because the trackage fee charged to BNSF is too high. The Board argues that it considered each of WCTL's arguments below, and that its decisions are supported by substantial evidence. We agree.

### B. Duopoly Pricing

WCTL and others argued before the Board that by creating two-railroad competition between UP/SP and BNSF in much of the West, the merger would result in duopoly pricing. However, the Board addressed WCTL's duopoly pricing argument in detail, and concluded that the merger would result in rivalry, not collusion. *UP/SP* at 42–43,

---

**3.** The ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803, enacted December 29, 1995, abolished the Interstate Commerce Commission and transferred certain functions and proceedings to the Surface Transportation Board. Section 204(b)(1) of the Act provides that proceedings pending before the ICC on the effective date of the Act shall be decided under law as in effect prior to that date insofar as the proceedings involved functions retained by the Board after the Act. Because the proceeding at issue here was pending with the ICC when the Act became effective, the earlier law is applicable in this case. Although the ICC Termination Act did make changes in the wording of the agency's pertinent authority, *compare former* 49 U.S.C. § 11344(a) *with new* 49 U.S.C. § 11324(a), no party claims the changes would have any significance in the present case.

116–21, 267–73. The Board noted that "the outcome·where just two companies offer the only significant competitive alternatives in a market may range all the way from intense rivalry to collusion, depending on the circumstances of the industry." *Id.* at 117. The Board analyzed the economic evidence of several witnesses, *id.* at 267–73, and concluded that tacit collusion was unlikely in this situation. In addition, the decision noted that there was wide support for the merger among shippers whose rail service options would decrease from three railroads to two as a result of the merger, indicating a lack of concern about possible collusion. Moreover, the Board concluded that since it was retaining jurisdiction to oversee competitive developments for five years, it would be able to take any necessary corrective action should there be evidence of collusion. *Id.* at 118.

Several of the Board's stated reasons for concluding that duopoly pricing was unlikely are challenged by WCTL. In particular, in rejecting the duopoly argument, the Board observed that there is no evidence that railroads have colluded to maintain above-market rate levels. *Id.* at 118. WCTL claims that it had demonstrated that collusion has occurred between railroads, as illustrated by *ETSI Pipeline Project v. Burlington Northern, Inc.*, Civil Action No. B–84–797–CA, 1989 U.S. Dist. LEXIS 18796 (E.D.Tex. June 5, 1989). In *ETSI*, the court found the evidence "overwhelming" that several railroads conspired to prevent or delay the entry of a coal slurry pipeline into the interstate coal transportation business, and accordingly granted a directed verdict. Whatever relevance *ETSI* might have to the possibility of railroad collusion regarding market entry, a type of behavior not at issue in this case, it does not imply that post-merger price collusion between UP and BNSF was necessarily likely. We see no tension between *ETSI* and the Board's conclusion that "[t]here is no evidence that railroads have colluded, overtly or tacitly, *to maintain inefficient operations, unresponsive service, or above-market rate levels.*" *UP/SP* at 118 (emphasis added). None of these matters were involved in *ETSI*.

In addition, the Board claimed that collusion was unlikely due to the secrecy about prices and services that pervades the rail industry. *Id.* at 267. WCTL argues that this reasoning was erroneous, given the fact that WCTL's witness David Weishaar had testified that approximations of rail rates can be derived from public data obtained from the Federal Energy Regulatory Commission. However, the Board's conclusion was supported by other evidence in the record. In particular, the statements of witnesses Barber and Sharp indicated that publicly available information on delivered coal prices would not allow one railroad to determine the transportation rate charged by another.

In rejecting the argument that collusion would be likely in a two-carrier market, the Board noted that the Powder River Basin has been a two-carrier market, yet the rates of BNSF and UP in that region have continued to decline. *UP/SP* at 118. WCTL claims that the Board's reliance on this example was erroneous, given evidence presented by WCTL that the factors that gave rise to that competition were no longer operative. However, the Board's reliance on the PRB example was supported by the statements of witnesses Peterson and Sharp, which were record evidence that the competition in the PRB did illustrate the viability of two-carrier markets. In addition, the Board itself gave another example of a competitive two-carrier market that WCTL apparently does not dispute, noting that CSX and Norfolk Southern are the only two rail carriers in a large portion of the East, and that the competitive pressures there have resulted in lower rates and better service. *See id.* at 118.

Finally, WCTL argues that the Board departed from its precedent in an earlier case where the Commission noted that a merger resulting in a two-railroad market might risk collusion. *See Santa Fe Southern Pac. Corp.–Control–Southern Pac. Transp. Co.*, 2 I.C.C.2d 709 (1986) ("*SFSP*"). However, the Board adequately justified its change of course, explaining that it now had the benefit of nine years of additional experience since the *SFSP* decision, during which it had witnessed decreasing rates in two-carrier markets. *UP/SP* at 117. Accordingly, we conclude that the Board gave a reasoned explanation for its decision that the merger

would not result in duopoly pricing, and that that conclusion was supported by substantial evidence.

## C.  Source Competition

■ In approving the merger, the Board also rejected arguments by WCTL that the merger would lead to decreased competition in rail transportation of various sources of western coal. Prior to the merger, UP and BNSF primarily shipped Powder River Basin coal, and SP primarily shipped coal from the Uinta Basin of Utah and Colorado. Coal from the PRB is lower-BTU coal, while the coal from the Uinta Basin is higher-BTU, and generally higher-cost as well. WCTL argues that, prior to the merger, one element of coal competition in the West was the competition between the admittedly different types of coal in the SP-served Uinta Basin and the UP-served Powder River Basin. While these types of coal are by no means interchangeable, WCTL claims that there are a number of utilities that can use either, or that can at least vary the proportions they use in "blending" in response to the delivered prices of these two coals. Postmerger, both the Uinta Basin and the Powder River Basin will be UP-served. Therefore, WCTL suggests that UP will not have an incentive to set aggressive rates for shipping Uinta Basin coal, since the PRB lines are more profitable, and that the "western coal market" will therefore suffer decreased competition.

The Board, however, rejected the claim that there is a single "western coal market" with meaningful competition between PRB coal and Uinta Basin coal. *Id.* at 126. WCTL claims that the Board's view was not justified, since WCTL presented testimony of several witnesses who described the competition between coal from the two areas in great detail. These witnesses explained that the competitive reach of cleaner-burning Uinta Basin coals had been expanded by marketing incentives, and by the impending deadline for compliance with the 1990 Clean Air Act Amendments. The testimony also provided 17 specific examples of utilities capable of burning either Uinta Basin or PRB coals.

Nonetheless, the Board concluded that there is "little meaningful source competition between UP and SP for coal because each originates coal that typically serves different markets." *Id.* at 127. The Board explained that because PRB coal is lower-cost, plants that can burn PRB coal do so, except to the extent that they need higher-BTU coal for blending. In addition, an increasing number of utilities are making capital investments allowing them to burn PRB coal. Thus, the Board found that UP competed intensively against BNSF for originations of PRB coal, not against SP movements of Uinta Basin coal. *Id.* at 127. Because it concluded that pre-merger competition between UP-served PRB coal and SP-served Uinta Basin coal was quite limited, the Board did not share WCTL's concerns that such competition would be harmed by UP's origination of coal from both areas postmerger. Indeed, the Board expressed confidence that UP would aggressively develop its origination of coal from both areas. *Id.* at 128.

We conclude that the Board's position was justified. The "source competition" argument advanced by WCTL is virtually identical to that it advanced in *Western Resources, Inc. v. STB,* 109 F.3d 782 (D.C.Cir.1997). The Commission there, like the Board here, rejected WCTL's broad definition of the "western coal market." This court upheld the Commission's decision. However, there, "the League offered almost no evidence of substitutability [of Uinta Basin coal for PRB coal]." *Id.* at 785. Here, the evidence of substitutability is more substantial—the statements of several witnesses, including Borts, Crowley, Weishaar, and Malhotra, supported this view. However, the evidence to the contrary is also substantial. As the Board's decision noted, applicants' witnesses Sharp and Sansom argued that, based on aggregate industry trends as well as plant-by-plant analyses, there was little premerger competition between PRB and Uinta Basin coals. *See UP/SP* at 127. Further, the Board cited the statement of witness Nock, who explained that the merged system would be able to expand competition in the Uinta Basin significantly. *Id.* at 128. In its decision, the Board acknowledged WCTL's arguments that some utilities can burn either type of coal, *id.* at 43, 127, but nonetheless concluded that there is actually little or no real competition between the two types of coal, *id.* at 127. Finding that the evidence supporting the Board's conclusion is substan-

tial, we decline WCTL's invitation to reweigh it.

## D. BNSF Trackage Fee

▮ Finally, WCTL argues that the conditions imposed by the Board will not ameliorate the merger's anticompetitive effects. In particular, WCTL argues that the trackage rights fee charged to BNSF under the settlement agreement incorporated as a merger condition is too high and will make it impossible for BNSF to compete effectively. Board precedent requires that charges for trackage rights imposed in mergers must put the tenant on an equal footing with the landlord. *See, e.g., Burlington Northern Inc.—Control & Merger—Santa Fe Pac. Corp.,* Finance Docket No. 32549, Decision No. 38, 1995 WL 528184, at 90 (ICC Aug. 23, 1995) *("BN/Santa Fe"), aff'd sub nom. Western Resources, Inc. v. STB,* 109 F.3d 782 (D.C.Cir.1997) and *Grainbelt Corp. v. STB,* 109 F.3d 794 (D.C.Cir.1997). WCTL argues that the current rates do not do that, but instead reward UP/SP with "monopoly rents."

We find WCTL's argument that the Board erred in adopting the negotiated trackage rights fee unpersuasive. The Board extensively discussed the trackage rights issue in its decision and found the negotiated trackage fee of 3.0 to 3.1 mills per gross ton-mile to be fully consistent with the principles set forth in its precedents. *See UP/SP* at 140–42. The standard method for establishing the level of compensation for trackage rights is described in *St. Louis Southwestern Railway–Trackage Rights,* 8 I.C.C.2d 213 (1991) *("SSW Compensation"),* where the ICC explained that to place a trackage rights tenant in the same position as a landlord, compensation for trackage rights must include not only the variable costs to the landlord resulting from the tenant's use of the track, but also a portion of fixed costs and a return element on the value of the rail properties. In the present decision, the Board concluded that the fee the parties agreed to in the settlement agreement was actually considerably lower than that the Board would have independently calculated under the usual *SSW Compensation* method. *UP/SP* at 140–41. While WCTL witness Crowley argued that under the *SSW Compensation* method, a rate of 1.8 mills would be correct, the Board's decision explained that that calculation contained several specific errors. The Board noted that correcting what it viewed as obvious errors in Crowley's calculation would lead to a rate of 3.84 mills, far higher than that negotiated by the parties. The Board's conclusion was supported by its citation to the statements of Kauders and Rebensdorf in the record. In addition, the Board noted that the settlement agreement gave BNSF the option of paying an alternative fee based on actual maintenance and operating expenses if desired. *UP/SP* at 142. Finally, the Board retained full authority to adjust the rates if necessary to competition during the five-year oversight period. *Id.* at 146. Accordingly, "we trust the [Board] to ensure that the compensation terms will not defeat the purpose of the trackage rights." *Southern Pac.,* 736 F.2d at 721.

## III. Conclusion

We hold that the challenged conclusions of the Board were supported by substantial evidence and were reached by reasoned decisionmaking, and accordingly deny the petition for review.